# DEPARTMENT OF THE NAVY *v.* EGAN

No. 86–1552.   Argued December 2, 1987—Decided February 23, 1988

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, and SCALIA, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 534. KENNEDY, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Cohen* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Michael K. Kellogg, Barbara L. Herwig,* and *Freddi Lipstein.*

*William J. Nold* argued the cause and filed a brief for respondent.*

---

*Daniel J. Popeo, Paul D. Kamenar,* and *Todd Natkin* filed a brief for the Washington Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation et al. by *John A. Powell, Helen Hershkoff,* and *Steven R. Shapiro;* for the American Federation of Labor and Congress of Industrial Organizations by *George Kaufmann* and *Laurence*

JUSTICE BLACKMUN delivered the opinion of the Court.

Respondent Thomas M. Egan lost his laborer's job at the Trident Naval Refit Facility in Bremerton, Wash., when he was denied a required security clearance. The narrow question presented by this case is whether the Merit Systems Protection Board (Board) has authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action. The Board ruled that it had no such authority. The Court of Appeals for the Federal Circuit, by a divided vote, reversed. We granted certiorari because of the importance of the issue in its relation to national security concerns. 481 U. S. 1068 (1987).

## I

Respondent Egan was a new hire and began his work at the facility on November 29, 1981. He served as a veteran's-preference-eligible civilian employee of the Navy subject to the provisions of the Civil Service Reform Act of 1978 (Act), 5 U. S. C. § 1201 *et seq.*

The mission of the Refit Facility is to provide quick-turn-around repair, replenishment, and systems check-out of the Trident submarine over its extended operating cycle. The Trident is nuclear-powered and carries nuclear weapons. It has been described as the most sophisticated and sensitive weapon in the Navy's arsenal and as playing a crucial part in our Nation's defense system. See *Concerned About Trident* v. *Schlesinger*, 400 F. Supp. 454, 462–466 (DC 1975), aff'd in part and rev'd in part, 180 U. S. App. D. C. 345, 555 F. 2d 817 (1977). As a consequence, *all* employee positions at the Refit Facility are classified as sensitive. Thus, as shown on his Standard Form, a condition precedent to Egan's retention of his employment was "satisfactory completion of security and medical reports."

*Gold;* for the National Federation of Federal Employees by *Patrick J. Riley;* and for Ralph B. Bogdanowicz by *Stuart A. Kirsch* and *Mark D. Roth.*

In April 1982, respondent gained the "noncritical-sensitive" position of laborer leader.[1] Pending the outcome of his security investigation, however, he performed only limited duties and was not permitted to board any submarine.

On February 16, 1983,[2] the Director of the Naval Civilian Personnel Command issued a letter of intent to deny respondent a security clearance. This was based upon California and Washington state criminal records reflecting respondent's convictions for assault and for being a felon in possession of a gun, and further based upon his failure to disclose on his application for federal employment two earlier convictions for carrying a loaded firearm. The Navy also referred to respondent's own statements that he had had drinking problems in the past and had served the final 28 days of a sentence in an alcohol rehabilitation program.

Respondent was informed that he had a right to respond to the proposed security-clearance denial. On May 6, he answered the Navy's letter of intent, asserting that he had paid his debt to society for his convictions, that he had not listed convictions older than seven years because he did not interpret the employment form as requiring that information, and that alcohol had not been a problem for him for three years preceding the clearance determination. He also provided favorable material from supervisors as to his background and character.

---

[1] A "noncritical-sensitive" position is defined to include "[a]ccess to Secret or Confidential information." Chief of Naval Operations Instructions (OPNAVINST) 5510.1F, ¶ 16–101–2.b (June 15, 1981). OPNAVINST 5510.1F was amended in April 1984 and is now OPNAVINST 5510.1G.

[2] This date is of some significance for by then respondent had been employed at the facility for more than a year. Title 5 U. S. C. § 7511(a)(1)(A) defines an "employee" as "an individual in the competitive service who is not serving a probationary or trial period under an initial appointment or who has completed 1 year of current continuous employment under other than a temporary appointment limited to 1 year or less." There is no dispute concerning respondent's status as an employee within the meaning of § 7511(a)(1)(A).

The Director, after reviewing this response, concluded that the information provided did not sufficiently explain, mitigate, or refute the reasons on which the proposed denial was based. Accordingly, respondent's security clearance was denied.

Respondent took an appeal to the Personnel Security Appeals Board, but his removal was effected before that Board acted (which it eventually did by affirming the denial of clearance).

Without a security clearance, respondent was not eligible for the job for which he had been hired. Reassignment to a nonsensitive position at the facility was not possible because there was no nonsensitive position there. Accordingly, the Navy issued a notice of proposed removal, and respondent was placed on administrative leave pending final decision. Respondent did not reply to the notice. On July 15, 1983, he was informed that his removal was effective July 22.

Respondent, pursuant to 5 U. S. C. § 7513(d), sought review by the Merit Systems Protection Board.[3] Under § 7513(a), an agency may remove an employee "only for such cause as will promote the efficiency of the service." The statute, together with § 7701 to which § 7513(d) specifically refers, provides the employee with a number of procedural protections, including notice, an opportunity to respond and be represented by counsel, and a decision in writing. The employee, unless he is a nonveteran in the excepted service, may appeal the agency's decision to the Board, as respondent did, which is to sustain the action if it is "supported by a preponderance of the evidence." § 7701(c)(1)(B).[4] The

---

[3] Section 7513(d) reads: "An employee against whom an action is taken under this section is entitled to appeal to the Merit Systems Protection Board under section 7701 of this title."

[4] We note at this point the presence of 5 U. S. C. § 7532. Under § 7532(a), the "head of an agency," "[n]otwithstanding other statutes," may suspend an employee "when he considers that action necessary in the interests of national security." After complying with specified procedures, the agency head may remove the suspended employee when "he determines

stated "cause" for respondent's removal was his failure to meet the requirements for his position due to the denial of security clearance. Before the Board, the Government argued that the Board's review power was limited to determining whether the required removal procedures had been followed and whether a security clearance was a condition for respondent's position. It contended that the Board did not have the authority to judge the merits of the underlying security-clearance determination.

The Board's presiding official reversed the agency's decision, ruling that the Board did have authority to review the merits. She further ruled that the agency must specify the precise criteria used in its security-clearance decision and must show that those criteria are rationally related to national security. App. to Pet. for Cert. 62a–63a. The agency then must show, by a preponderance of the evidence, that the employee's acts precipitating the denial of his clearance actually occurred, and that his "alleged misconduct has an actual or potentially detrimental effect on national security interests." *Id.*, at 63a. The official then held that the ultimate burden was upon the agency to persuade the Board of the appropriateness of its decision to deny clearance. *Id.*, at 64a.

The official concluded that it was not possible to determine whether the Navy's denial of respondent's security clearance was justified because it had not submitted a list of the criteria it employed and because it did not present evidence that it had "conscientiously weighed the circumstances surrounding [respondent's] alleged misconduct and reasonably balanced it against the interests of national security." *Id.*, at 65a. She accordingly concluded that the Navy had "failed to show it reached a reasonable and warranted decision concerning the

---

that removal is necessary or advisable in the interests of national security." His determination then is "final." § 7532(b). Removal under § 7532 is not subject to Board review. § 7512(A). In respondent's case the Navy did not invoke § 7532; his removal, therefore, presumably would be subject to Board review as provided in § 7513.

propriety of the revocation of [respondent's] security clearance." *Id.*, at 66a. The decision to remove respondent, therefore, could not stand.

The Navy petitioned for full Board review of the presiding official's ruling.[5] In a unanimous decision, the Board reversed the presiding official's ruling and sustained the agency's removal action. 28 M. S. P. R. 509 (1985). It observed that §§ 7512 and 7513 "do not specifically address the extent of the Board's review of the underlying determinations." 28 M. S. P. R., at 514. Neither did the legislative history of the Act "address the extent of the authority Congress intended the Board to exercise in reviewing revocations or denials of security clearances which result in Chapter 75 actions." *Id.*, at 515. The Board found no binding legal precedent. It acknowledged the presence of the decision in *Hoska* v. *Department of Army*, 219 U. S. App. D. C. 280, 677 F. 2d 131 (1982) (security clearance revocation leading to dismissal reviewed on its merits), but explained that case away on the ground that the court did not "expressly address the Board's authority to review the underlying reasons for the agency's security clearance determination." 28 M. S. P. R., at 516. Thus, earlier Board cases that had relied upon *Hoska*, see, *e. g.*, *Bogdanowicz* v. *Department of Army*, 16 M. S. P. R. 653 (1983), involved a "reliance misplaced," and the holding that they stood "for the proposition that the Board has the authority to review the propriety of the agency's . . . denial of a security clearance" was "now overrule[d]." 28 M. S. P. R., at 516. It went on to say that

---

[5] The Solicitor General informs us, see Brief for Petitioner 6, that the Board had before it numerous petitions for review raising similar issues of law, and treated the present litigation as the lead case. The Board had invited and received briefs from interested agencies, employee organizations, and others concerning the proper scope of its review and whether § 7532, see n. 4, *supra*, is the exclusive authority for a removal based upon national security concerns. See 49 Fed. Reg. 48623–48624 (1984); 50 Fed. Reg. 2355 (1985).

"section 7532 is not the exclusive basis for removals based upon security clearance revocations." *Id.*, at 521.

Respondent, pursuant to § 7703, appealed to the Court of Appeals for the Federal Circuit. By a divided vote, that court reversed the Board's decision that it had no authority to review the merits of a security-clearance determination underlying a removal. 802 F. 2d 1563 (1986). It agreed with the Board that § 7532 is not the sole authority for a removal based upon national security concerns. 802 F. 2d, at 1568. It noted, however, that the agency had chosen to remove respondent under § 7512 rather than § 7532 and thus that it chose the procedure "that carrie[d] Board review under section 7513," 802 F. 2d, at 1569, including review of the merits of the underlying agency determination to deny a security clearance. The court then remanded the case to the Board for such review, stating that the question of an appropriate remedy, should the Board now rule that a security clearance was improperly denied, was not yet ripe. *Id.*, at 1573–1575.

The dissenting judge in the Court of Appeals concluded that respondent had received all the procedural protections to which he was entitled, *id.*, at 1577–1578; that the majority in effect was transferring a discretionary decision vested in an executive agency to a body that had neither the responsibility nor the expertise to make that decision; that the ruling raised separation-of-powers concerns; and that the Board would be unable to provide an appropriate remedy. *Id.*, at 1578, 1580–1583.

## II

We turn first to the statutory structure. Chapter 75 of Title 5 of the United States Code is entitled "Adverse Actions." Its subchapter II (§§ 7511–7514) relates to removals for "cause." Subchapter IV (§§ 7531–7533) relates to removals based upon national security concerns. An employee removed for "cause" has the right, under § 7513(d), to appeal to the Board. In contrast, an employee suspended under

§ 7532(a) is not entitled to appeal to the Board. That employee, however, is entitled to specified preremoval procedural rights, including a hearing by an agency authority. § 7532(c)(3).

Chapter 77 of Title 5 (§§ 7701–7703) is entitled "Appeals," and Chapter 12 (§§ 1201–1209) relates to the "Merit Systems Protection Board and Special Counsel." Section 1205(a) provides that the Board shall "hear, adjudicate, or provide for the hearing or adjudication of all matters within the jurisdiction of the Board" and shall "order any Federal agency or employee to comply with any order or decision issued by the Board." In the present litigation, there is no claim that the Board did not have jurisdiction to hear and adjudicate respondent's appeal.

It is apparent that the statutes provide a "two-track" system. A removal for "cause" embraces a right of appeal to the Board and a hearing of the type prescribed in detail in § 7701. Suspension and removal under § 7532, however, entail no such right of appeal. Respondent takes the straightforward position that, inasmuch as this case proceeded under § 7513, a hearing before the Board was required. The Government agrees. What is disputed is the subject matter of that hearing and the extent to which the Board may exercise reviewing authority. In particular, may the Board, when § 7513 is pursued, examine the merits of the security-clearance denial, or does its authority stop short of that point, that is, upon review of the fact of denial, of the position's requirement of security clearance, and of the satisfactory provision of the requisite procedural protections?

### III

The Court of Appeals' majority stated: "The absence of any statutory provision precluding appellate review of security clearance denials in section 7512 removals creates a strong presumption in favor of appellate review," citing *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 141 (1967). 802 F. 2d,

at 1569. One perhaps may accept this as a general proposition of administrative law, but the proposition is not without limit, and it runs aground when it encounters concerns of national security, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch.

The President, after all, is the "Commander in Chief of the Army and Navy of the United States." U. S. Const., Art. II, § 2. His authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant. See *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 890 (1961). This Court has recognized the Government's "compelling interest" in withholding national security information from unauthorized persons in the course of executive business. *Snepp* v. *United States*, 444 U. S. 507, 509, n. 3 (1980). See also *United States* v. *Robel*, 389 U. S. 258, 267 (1967); *United States* v. *Reynolds*, 345 U. S. 1, 10 (1953); *Totten* v. *United States*, 92 U. S. 105, 106 (1876). The authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief.

Since World War I, the Executive Branch has engaged in efforts to protect national security information by means of a classification system graded according to sensitivity. See Note, Developments in the Law—The National Security Interest and Civil Liberties, 85 Harv. L. Rev. 1130, 1193–1194 (1972). After World War II, certain civilian agencies, including the Central Intelligence Agency, the National Security Agency, and the Atomic Energy Commission, were en-

trusted with gathering, protecting, or creating information bearing on national security. Presidents, in a series of Executive Orders, have sought to protect sensitive information and to ensure its proper classification throughout the Executive Branch by delegating this responsibility to the heads of agencies. See Exec. Order No. 10290, 3 CFR 789 (1949–1953 Comp.); Exec. Order No. 10501, 3 CFR 979 (1949–1953 Comp.); Exec. Order No. 11652, 3 CFR 678 (1971–1975 Comp.); Exec. Order No. 12065, 3 CFR 190 (1979); Exec. Order No. 12356, § 4.1(a), 3 CFR 174 (1983). Pursuant to these directives, departments and agencies of the Government classify jobs in three categories: critical sensitive, noncritical sensitive, and nonsensitive. Different types and levels of clearance are required, depending upon the position sought. A Government appointment is expressly made subject to a background investigation that varies according to the degree of adverse effect the applicant could have on the national security. See Exec. Order No. 10450, § 3, 3 CFR 937 (1949–1953 Comp.).

It should be obvious that no one has a "right" to a security clearance. The grant of a clearance requires an affirmative act of discretion on the part of the granting official. The general standard is that a clearance may be granted only when "clearly consistent with the interests of the national security." See, e. g., Exec. Order No. 10450, §§ 2 and 7, 3 CFR 936, 938 (1949–1953 Comp.); 10 CFR § 710.10(a) (1987) (Department of Energy); 32 CFR § 156.3(a) (1987) (Department of Defense). A clearance does not equate with passing judgment upon an individual's character. Instead, it is only an attempt to predict his possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information. It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct,

such as having close relatives residing in a country hostile to the United States. "[T]o be denied [clearance] on unspecified grounds in no way implies disloyalty or any other repugnant characteristic." *Molerio* v. *FBI*, 242 U. S. App. D. C. 137, 146, 749 F. 2d 815, 824 (1984). The attempt to define not only the individual's future actions, but those of outside and unknown influences renders the "grant or denial of security clearances . . . an inexact science at best." *Adams* v. *Laird*, 136 U. S. App. D. C. 388, 397, 420 F. 2d 230, 239 (1969), cert. denied, 397 U. S. 1039 (1970).

Predictive judgment of this kind must be made by those with the necessary expertise in protecting classified information. For "reasons . . . too obvious to call for enlarged discussion," *CIA* v. *Sims*, 471 U. S. 159, 170 (1985), the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk. The Court accordingly has acknowledged that with respect to employees in sensitive positions "there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information." *Cole* v. *Young*, 351 U. S. 536, 546 (1956). As noted above, this must be a judgment call. The Court also has recognized "the generally accepted view that foreign policy was the province and responsibility of the Executive." *Haig* v. *Agee*, 453 U. S. 280, 293–294 (1981). "As to these areas of

Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." *United States* v. *Nixon*, 418 U. S. 683, 710 (1974). Thus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs. See, *e. g., Orloff* v. *Willoughby*, 345 U. S. 83, 93–94 (1953); *Burns* v. *Wilson*, 346 U. S. 137, 142, 144 (1953); *Gilligan* v. *Morgan*, 413 U. S. 1, 10 (1973), *Schlesinger* v. *Councilman*, 420 U. S. 738, 757–758 (1975); *Chappell* v. *Wallace*, 462 U. S. 296 (1983).

We feel that the contrary conclusion of the Court of Appeals' majority is not in line with this authority.

## IV

Finally, we are fortified in our conclusion when we consider generally the statute's "express language" along with "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 345 (1984).

The Act by its terms does not confer broad authority on the Board to review a security-clearance determination. As noted above, the Board does have jurisdiction to review "adverse actions," a term, however, limited to a removal, a suspension for more than 14 days, a reduction in grade or pay, and a furlough of 30 days or less. §§ 7513(d), 7512. A denial of a security clearance is not such an "adverse action," and by its own force is not subject to Board review. An employee who is removed for "cause" under § 7513, when his required clearance is denied, is entitled to the several procedural protections specified in that statute. The Board then may determine whether such cause existed, whether in fact clearance was denied, and whether transfer to a nonsensitive position was feasible. Nothing in the Act, however, directs or empowers the Board to go further. Cf. *Zimmer-*

*man* v. *Department of Army*, 755 F. 2d 156 (CA Fed. 1985); *Buriani* v. *Department of Air Force*, 777 F. 2d 674, 677 (CA Fed. 1985); *Bacon* v. *Department of Housing & Urban Development*, 757 F. 2d 265, 269–270 (CA Fed. 1985); *Madsen* v. *VA*, 754 F. 2d 343 (CA Fed. 1985).[6]

As noted above, security clearance normally will be granted only if it is "clearly consistent with the interests of the national security." The Board, however, reviews adverse actions under a preponderance of the evidence standard. § 7701(c)(1)(B). These two standards seem inconsistent. It is difficult to see how the Board would be able to review security-clearance determinations under a preponderance of the evidence standard without departing from the "clearly consistent with the interests of the national security" test. The clearly consistent standard indicates that security-clearance determinations should err, if they must, on the side of denials. Placing the burden on the Government to support the denial by a preponderance of the evidence would inevitably shift this emphasis and involve the Board in second-guessing the agency's national security determinations. We consider it ex-

[6] Prior to the Act's passage in 1978, most federal employees dismissed for cause could pursue an appeal to the Civil Service Commission. The parties here appear to agree that the old Commission never exercised jurisdiction over a security-clearance determination. We fail to see any indication that Congress intended to grant the Board greater jurisdiction in this respect than that possessed by the Civil Service Commission. The Board was created to assume the adjudicatory functions of the old Commission and, with certain exceptions, those functions passed unchanged from the Commission to the Board. When the Senate and House Committees listed the changes effected by the Act, they gave no indication that an agency's security-clearance determination was now to be subject to review. See S. Rep. No. 95–969, pp. 46 and 52 (1978); H. R. Rep. No. 95–1403, pp. 21, 22 (1978). Such changes as were made did not bear upon the issue. If there be any contrary implication in the legislative history, as respondent would suggest, it is much too frail for us to conclude that Congress intended a major change of that kind.

tremely unlikely that Congress intended such a result when it passed the Act and created the Board.

Respondent presses upon us the existence of § 7532 with its provision for an employee's summary removal. The Court of Appeals' majority concluded that § 7532 was not the exclusive means for removal on national security grounds. 802 F. 2d, at 1568.[7] The parties to the present litigation are in no dispute about the alternative availability of § 7513 or § 7532. They assume, as the Federal Circuit held, that § 7532 does not pre-empt § 7513 and that the two statutes stand separately and provide alternative routes for administrative action. There is no reason for us to dispute that conclusion here for, in this respect, we accept the case as it comes to us.

Respondent points out the Government's acknowledgment that the remedy under § 7532 is "drastic" in that the employee may be suspended summarily and thereafter removed after such investigation and review as the agency head considers necessary; in that neither the suspension nor the removal is subject to outside review; in that the employee is not eligible for any other position in the agency and may not be appointed to a position elsewhere in the Government without consultation with the Office of Personnel Management; and in that the section requires the head of the agency to act personally. At the same time, respondent would say, as did the Court of Appeals, 802 F. 2d, at 1572, that the Board's deci-

---

[7] But cf. *Doe* v. *Weinberger*, 261 U. S. App. D. C. 96, 101, 820 F. 2d 1275, 1280 (1987), cert. pending *sub nom. Carlucci* v. *Doe*, No. 87–751. If the District of Columbia Circuit's holding in *Doe* (to the effect that § 7532 is not merely "an extra option," 261 U. S. App. D. C., at 101, 820 F. 2d, at 1280, for the removal of an employee of the National Security Agency, to which 50 U. S. C. §§ 831 and 832 apply) is pertinent with respect to the Navy's power to dismiss an employee for cause under § 7513, that ruling would conflict with the Federal Circuit's holding in the present case that the Navy may proceed under § 7513. This Court will meet the issue in *Doe* when it comes to it. We decide the present case on the parties' assumption that § 7513 was available to the Navy in this case and that it proceeded thereunder.

sion in the present case suggests an anomaly in that an employee removed under § 7513 is entitled to less process than one removed under § 7532. The argument is that the availability of the § 7532 procedure is a "compelling" factor in favor of Board review of a security-clearance denial in a case under § 7513. We are not persuaded.

We do not agree that respondent would have received greater procedural protections under § 7532 than he received in the present case. Respondent received notice of the reasons for the proposed denial, an opportunity to inspect all relevant evidence, a right to respond, a written decision, and an opportunity to appeal to the Personnel Security Appeals Board. Until the time of his removal, he remained on full-pay status. His removal was subject to Board review that provided important protections outlined above. In contrast, had he been removed under § 7532, he would have received notice to "the extent that the head of the agency determines that the interests of national security permit," a hearing before an agency board, and a decision by the head of the agency. He could have been suspended without pay pending the outcome. He would not have been entitled to any review outside the agency, and, once removed, he would have been barred from employment with the agency. In short, § 7532, instead, provides a procedure that is harsh and drastic both for the employee and for the agency head, who must act personally in suspending and removing the employee. See §§ 7532(a) and (b).

Respondent's argument that the Board's decision in this case creates an anomaly seems to come down to his contention that, had he been removed under § 7532, he would have been entitled to a trial-type hearing prior to his removal. Even assuming he would be entitled to such a hearing under § 7532, however, we would still consider the two procedures not anomalous, but merely different. As explained above, we doubt whether removal under § 7532, even as envisioned

by respondent, would have amounted to "more" procedural protection.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE WHITE, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

It cannot be denied that the Government has a "compelling interest" in safeguarding the Nation's secrets.   See *ante,* at 527.   I see no necessity for this Court to rewrite the civil service statutes in the name of national security, however, since those statutes already provide a procedure that protects sensitive information without depriving federal employees such as respondent of a hearing into the underlying reasons for their discharge.

The parties do not dispute that respondent was discharged from his civilian "laborer leader" position with the U. S. Navy pursuant to subchapter II of the Civil Service Reform Act, 5 U. S. C. §§ 7511–7514.   A federal agency may discharge an employee under those statutory provisions "only for such cause as will promote the efficiency of the service." § 7513(a).   The employee is entitled to appeal the agency's action to the Merit Systems Protection Board.   § 7513(d). The Board must afford the employee "a hearing for which a transcript will be kept."   § 7701(a)(1).   The employee's discharge is to be sustained by the Board only if "supported by a preponderance of the evidence."   § 7701(c)(1)(B).

There is nothing in these statutory provisions to suggest that the Board is to scrutinize discharges on national security grounds any less comprehensively than other discharges for "cause."   Nor does the legislative history of these provisions suggest that the Board is foreclosed from examining the reasons underlying the discharges of employees who are alleged to be security risks.

If Congress had remained silent on the subject of national security discharges throughout the Civil Service Reform Act, I might feel compelled to read into the foregoing provisions some restrictions on the scope of Board review of such discharges. It might be appropriate in such circumstances to assume that Congress intended that such restrictions be inferred by the Board and the courts.

Congress did not remain silent, however, with regard to national security discharges. Rather, Congress carefully provided an alternative procedure to be used when the Government determines that an employee's removal is "necessary or advisable in the interests of national security." 5 U. S. C. § 7532(b). The employee is entitled under this procedure to "a written statement of the charges against him," "an opportunity . . . to answer the charges and submit affidavits," "a hearing . . . by an agency authority duly constituted for this purpose," "a review of his case by the head of the agency or his designee," and "a written statement of the decision of the head of the agency." § 7532(c). The decision of the agency head is "final." § 7532(b). It is not disputed that the Navy could have proceeded against respondent under § 7532.

The sensible inference to be drawn from Congress' enactment of the procedural protections of § 7532 for employees discharged "in the interests of national security" and its silence with regard to the procedures applicable to similarly motivated discharges under other sections of the civil service statutes is that Congress intended to guarantee every discharged employee a hearing into the "cause" for his removal. If the employee is discharged under § 7532, he is entitled to a hearing before his own agency; if the employee is discharged under other provisions of Title 5, he is entitled to a hearing before the Board.

Yet, the majority's decision frustrates this congressional intent by denying any meaningful hearing to employees such as respondent who are discharged on national security grounds under provisions other than § 7532. In such cases,

the employing agency has no statutory obligation to afford the employee a hearing, and the Board now need determine only "whether in fact [a security] clearance was denied, and whether transfer to a nonsensitive position was feasible." *Ante,* at 530. Hence, the employee cannot demand a hearing into claims that he was branded a security risk based on false allegations or on reasons that lack any rational nexus to national security concerns.

It is difficult to reconcile today's decision with the Court's discussion in *Greene* v. *McElroy,* 360 U. S. 474 (1959), of the procedural protections available to an employee of a Government contractor who had been denied a security clearance based on his alleged Communist associations and sympathies:

> "Before we are asked to judge whether, in the context of security clearance cases, a person may be deprived of the right to follow his chosen profession without full hearings where accusers may be confronted, it must be made clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use. Such decisions cannot be assumed by acquiescence or non-action. They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, . . . but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws." *Id.,* at 507 (citations omitted).

It is far from clear in the instant circumstances that Congress or the President has decided that discharging alleged security risks without any sort of hearing is "necessary or warranted" or has explicitly authorized such a procedure. Instead, the majority assumes such a result from congressional "nonaction." For example, the majority emphasizes that "[n]othing in the [Civil Service Reform] Act . . . directs or

empowers the Board to go further" than to determine whether a security clearance was indeed denied and whether transfer to a nonsensitive position was possible. *Ante*, at 530. There is likewise nothing in the Act, however, that directs the Board *not* to "go further."

Today's result is not necessary to protect the Nation's secrets. If an agency fears that the Board will not be sufficiently sensitive to the national security implications of a discharge decision,[1] the agency may foreclose external review of that decision by proceeding against the employee under § 7532. The agency would be required in such circumstances, however, to afford the employee an internal hearing into the reasons for his termination. The agency could not discharge the employee, as the Navy did here, without affording him any hearing into the merits of his discharge.

---

[1] There is no reason to assume that the Board would be insensitive to national security concerns. It is questionable whether the Board would often have to consider sensitive information in determining whether an agency had cause to discharge an employee on national security grounds. No such information appears to have been at issue in the instant case. Moreover, in those cases in which sensitive information would have to be considered, the Board could be expected to adopt procedures (*e. g., in camera* inspection of classified documents) similar to those utilized by the courts in similar circumstances. It appears that the courts have previously adjudicated cases involving denials of security clearances without any documented harm to national security. See, *e. g., Hoska* v. *United States Department of Army*, 219 U. S. App. D. C. 280, 677 F. 2d 131 (1982); *Gayer* v. *Schlesinger*, 160 U. S. App. D. C. 172, 490 F. 2d 740 (1973); *McKeand* v. *Laird*, 490 F. 2d 1262 (CA9 1973). Finally, given the requirement of Executive Order No. 10450, 3 CFR 937 (1949–1953 Comp.), that security clearances be granted only if "clearly consistent with the interests of the national security," I would assume that the Board's review of national security discharges would be suitably deferential to the employing agency even under the preponderance of the evidence standard prescribed by § 7701(c)(1)(B). It is questionable whether the Board's inquiry into such discharges would be qualitatively different from its inquiry into discharges for other varieties of "cause." The Board routinely evaluates such factors as loyalty, trustworthiness, and judgment in determining whether an employee's discharge will "promote the efficiency of the service."

The majority suggests that respondent would have received no more procedural protection under § 7532 than under § 7513 notwithstanding that he was guaranteed a hearing on the merits under the former provision but not under the latter. *Ante*, at 533. This conclusion does not show sufficient regard for our many decisions recognizing the particularly important role of the hearing in assuring that individuals are not wrongfully deprived of their livelihoods or other significant interests. See, *e. g., Wolff* v. *McDonnell,* 418 U. S. 539, 557–558 (1974); *Perry* v. *Sindermann,* 408 U. S. 593, 603 (1972); *Stanley* v. *Illinois,* 405 U. S. 645, 652–658 (1972); *Goldberg* v. *Kelly,* 397 U. S. 254, 269–270 (1970). I cannot assume that the proceedings required under § 7532 would not provide an employee with a meaningful opportunity to be heard simply because they are conducted by an agency authority rather than by the Board.[2]

In sum, absent any indication that Congress or the President intended to deny federal employees discharged on national security grounds a full hearing before either the Board or their employing agency into the merits of their removal, I respectfully dissent.

---

[2] The § 7532 procedure is not as "harsh and drastic" as the majority contends to either the employee or the agency head. The majority asserts that, if respondent had been discharged under § 7532, "he would have been barred from employment with the agency." *Ante,* at 533. Respondent, however, could have obtained other employment with the Navy even if he had been discharged under § 7532; the civil service statutes expressly authorize the reinstatement of persons removed under § 7532 "in the discretion of the head of the agency concerned." § 3571. It has never been suggested that the Navy would not rehire respondent for a position that does not require a security clearance. Moreover, while the majority asserts that the agency head "must act personally" to discharge an employee under § 7532, *ante,* at 533, the statute provides for final review of discharge decisions by "the head of the agency *or his designee.*" § 7532(c)(3)(D) (emphasis added).