**Richard L. WRIGHT, et al., Plaintiffs,**

v.

**Ernest C. PARK, et al., Defendants.**

**Civ. No. 92–0041–B.**

United States District Court,
D. Maine.

Jan. 26, 1993.

Peter Adams Anderson, Bangor, ME, for Wright.

George T. Dilworth, Asst. U.S. Atty., Portland, ME, for defendants.

John E. Carnes, Augusta, ME, for Maine Human Rights Com'n.

## ORDER AND MEMORANDUM OF OPINION

BRODY, District Judge.

Defendants General Ernest Park, General Nelson Durgin, General Nicholas Eremita, and Colonel Wilfred Hessert ("Defendants") filed a Motion for Summary Judgment on September 17, 1992. Plaintiffs Richard Wright and Maine Human Rights Commission allege that Wright was removed from his job as Deputy Commander for Maintenance ("DCM") in the Maine National Guard because he "blew the whistle" concerning General Park's unauthorized

use of military aircraft and safety violations at the Maine Air National Guard base in Bangor. Defendants assert that Plaintiffs' claims present a nonjusticiable military controversy. Applying the balancing test set forth in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir.1971), the Court is satisfied that Plaintiffs' claims are nonjusticiable. Therefore, Defendants' Motion for Summary Judgment is *GRANTED*.

## I. BACKGROUND

Plaintiff Wright joined the 101st Air Refueling Wing ("101st") of the Maine Air National Guard as a full-time technician in 1970. This followed service in the United States Air Force. By 1987, Wright attained the rank of Lieutenant Colonel and served as a Flight Training Instructor.

In 1987, General Eremita became Wing Commander of the 101st. General Eremita appointed Wright as DCM and arranged for General Park, the Adjutant General, to reassign Wright to the position of Aircraft Maintenance Officer. As DCM, Wright supervised approximately 130 technicians and 320 traditional guardsmen. He was responsible for ensuring that the 101st's ten KC–135E tankers were in safe, operable condition.

Wright served as DCM for approximately three years. In early 1990, General Eremita took steps to relieve Wright of his command of the maintenance unit and place him in a different position, outside the maintenance arena. On March 2, 1990, Wright received notice that he had been reassigned to Airplane Flight Instructor. The notification provided Wright with ten calendar days to accept or reject the reassignment. Wright's employment would be terminated after thirty days if he did not accept the reassignment. Wright informed the Support Personnel Management Officer that he would not accept the reassignment and was subsequently terminated.

Plaintiffs assert that Wright was reassigned solely because he reported what he perceived to be (1) unlawful use of military aircraft by General Park and (2) safety violations in the operation and maintenance of military aircraft. Plaintiffs allege a conspiracy to retaliate against Wright for reporting these practices and conditions. These claims are brought pursuant to 42 U.S.C. § 1983; 42 U.S.C. § 1985; federal whistleblower laws, 5 U.S.C. §§ 2301–02; and the Maine Whistleblowers' Protection Act, 26 M.R.S.A. §§ 831, *et seq.* Plaintiffs also claim attorneys' fees under 42 U.S.C. § 1988 and seek punitive damages but they acknowledge that these two claims will fail if summary judgment is granted on Counts I–III.

Defendants counter that the claims are nonjusticiable. Furthermore, with regard to the whistleblower claims, Defendants note the extraordinary measures taken by Wright to conceal his identity when reporting the alleged violations. Defendants assert that there is no evidence to establish the fact that they had knowledge of Wright's actions prior to the reassignment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court views the entire record "in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

## III. DISCUSSION

### 1. *The National Guard*

"The [National] Guard is an essential reserve component of the Armed Forces of the United States, available with regular forces in time of war." *Gilligan v. Morgan*, 413 U.S. 1, 7, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407 (1973). It "does not fit neatly within the scope of either state or national concerns; historically the Guard has been, and today remains, something of a hybrid." *New Jersey Air Nat'l Guard v. Fed. Labor Relations Authority*, 677 F.2d 276, 278–79

(3d Cir.1982). The National Guard is a unique military force in that each unit within the Guard is responsible to two governments, one local, and the other federal. *Penagaricano v. Llenza*, 747 F.2d 55, 56 (1st Cir.1984).

The state organizations known as Air National Guards are defined in 32 U.S.C. § 101(6):

"Air National Guard" means that part of the organized militia of the several States and Territories, Puerto Rico, and the District of Columbia, active and inactive, that—

(A) is an air force;

(B) is trained, and has its officers appointed, under the sixteenth clause of section 8, article I, of the Constitution;

(C) is organized, armed, and equipped wholly or partly at federal expense; and

(D) is federally recognized.

" 'Federal Recognition' means acknowledgement by the federal government that the persons appointed by the state to the Guard meet the prescribed federal standards for their particular service grade." *Penagaricano*, 747 F.2d at 56. As a consequence of federal recognition, members of the Air National Guard hold concurrent membership in a distinct federal military organization, the Air National Guard of the United States ("ANGUS"). *Id.* ANGUS retains the authority to call members of the Air National Guard into federal service. 10 U.S.C. § 8351(c).

Most National Guard members hold full-time civilian jobs and participate in drills only on weekends and for a more extended period during the summer. To compensate for the predominately part-time nature of the Guard, the Air National Guard hires full-time "technicians" to maintain equipment and facilities, train other members of the Guard, and provide clerical support. *Penagaricano*, 747 F.2d at 57 n. 2.

Pursuant to the National Guard Technicians Act, Guard technicians are employees of the Department of the Air Force and of the federal government. 32 U.S.C. § 709(d). They are hired and supervised by the Adjutant General pursuant to Air Force regulations and must be terminated if they are separated from either the Air National Guard or ANGUS. 32 U.S.C. § 709(c) and (e)(1).

▮ne of the express purposes of the National Guard Technicians Act was to "recognize the military characteristics of the National Guard" by requiring civilian technicians to be military members of the National Guard and by providing for their supervision by the adjutant general pursuant to regulations prescribed by the secretary of the relevant military department. *NeSmith v. Fulton*, 615 F.2d 196, 201 (5th Cir.1980) (citing H.R.Rep. No. 1823, 90th Cong., 2nd Sess. (1968)).

### 2. *Justiciability*

The hybrid nature of the National Guard is well documented. This does not, however, dilute the role that the Guard plays in our nation's defense or the power that Congress has in setting its policies. "It is clear that the Constitution contemplated that the Legislative Branch have plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline; and Congress and the courts have acted in conformity with that view." *Chappell v. Wallace*, 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983). Congress has carefully detailed the relationship between the Guard and its technicians. *See* 32 U.S.C. § 709. As Plaintiff Wright's challenge to his reassignment involves this relationship, the appropriateness of judicial intrusion into the military action must necessarily be addressed. *NeSmith*, 615 F.2d at 201.

▮ A National Guard technician's right to bring a section 1983 action against the technician's superiors is firmly established. *See Johnson v. Orr*, 780 F.2d 386 (3d Cir. 1986). The next step, however, is whether a court will review the alleged violation. The First Circuit has adopted the four-pronged test established in *Mindes v. Seaman* for determining the reviewability of claims arising incident to military service. *See Pauls v. Secretary of Air Force*, 457

F.2d 294 (1st Cir.1972). The test was used in *Penagaricano* to uphold the dismissal of a National Guard civilian technician.

In determining when internal military affairs should be subjected to judicial review, the *Mindes* court held:

> What we really determine is a judicial policy akin to comity. It is a determination made up of several subjective and interrelated factors. Traditional judicial trepidation over interfering with the military establishment has been strongly manifested in an unwillingness to second-guess judgments requiring military expertise and in a reluctance to substitute court orders for discretionary military decisions. Concern has also been voiced that the courts would be inundated with servicemen's complaints should the doors of reviewability be opened. But the greatest reluctance to accord judicial review has stemmed from the proper concern that such review might stultify the military in the performance of its vital mission.

*Mindes,* 453 F.2d at 199.

The *Mindes* court distilled the applicable caselaw to conclude that a court should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures.[1] *Mindes* provides:

> A district court faced with a sufficient allegation must examine the substance of that allegation in light of the policy reasons behind nonreview of military matters. In making that examination, such of the following factors as are present must be weighed (although not necessarily in the order listed).
> 1. The nature and strength of the plaintiff's challenge to the military determination. Constitutional claims, normally more important than those having a statutory or regulatory base, are themselves unequal in the whole scale of values—compare haircut regulation questions to those arising in court-martial situations which raise issues of personal liberty. An obviously tenuous claim of any sort must be weighed in favor of declining review....
> 2. The potential injury to the plaintiff if review is refused.
> 3. The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.
> 4. The extent to which the exercise of military expertise or discretion is involved. Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions.
>
> We do not intimate how these factors should be balanced in the case sub judice. That is the trial court's function.

*Id.* at 201–02.

While the *Mindes* court declined to indicate how the four factors should be balanced, *Penagaricano* gives greater weight to the last two factors. "We are inclined to weigh the last two factors heavily in view of the reservations many courts have expressed as to a civilian court's authority to countermand a military decision or order that is within the decisionmaker's sphere of discretion and expertise." *Penagaricano,* 747 F.2d at 63–64.

---

1. As *Penagaricano* notes, "courts demand that military personnel with grievances against the military establishment or its personnel must exhaust the administrative remedies provided by the military service before seeking relief in civilian courts." *Penagaricano,* 747 F.2d at 61. It is not clear to this Court whether Plaintiff Wright has brought his case before the Air Force Board for the Correction of Military Records. If not, the failure to do so may arguably constitute a failure to exhaust administrative remedies. We will not address this threshold question, however, because we are satisfied that Plaintiffs' case is nonjusticiable under the remainder of the *Mindes* test.

### a. Counts I and II

■ Counts I and II appear to seek relief under 42 U.S.C. § 1983 and 42 U.S.C. § 1985, respectively. Specifically, Plaintiffs allege in Count I that Defendants acted in a concerted, conspiratorial manner in reassigning Plaintiff Wright. Plaintiffs also contend that Defendants did not comply with the procedural dictates of Technician Personnel Regulation No. 715 ("TRP 715") in reassigning Wright. Count II alleges that Defendants conspired to deprive Wright of equal protection under the law, suspend Wright's security clearance, and cause Wright to lose his employment in retaliation for his reporting of perceived and actual illegal activities by some or all of the Defendants. Plaintiffs seek compensatory damages of $1,000,000.00 for each of these Counts.

■ The first step under *Mindes* is to examine the nature and strength of Plaintiffs' claims. In Count I, Plaintiffs claim that Defendants conspired to reassign Wright in retaliation for his reporting of possibly illegal or inappropriate activities. The serious nature of this allegation favors review. This is countered, however, by the apparent weakness of Plaintiffs' evidence on these claims.

■ Plaintiffs allege that Wright's procedural due process rights were violated by the reassignment. Because this is a constitutional claim, *Mindes* accords it more weight than statutory or regulatory claims. *Id.* at 201. However, *Penagaricano* held that there is no constitutionally protected property interest in continued employment with the Guard. *Penagaricano*, 747 F.2d at 62. *Penagaricano's* holding came despite the plaintiff's allegation that his dismissal resulted from a conspiracy against him because of his political beliefs and affiliations. Therefore, Wright's procedural due process argument is not persuasive.

■ Evidently, General Park did not clearly indicate the reasons for Wright's reassignment. In this regard, he did not conform to the requirements of TRP 715.[2] Under the *Mindes* test, however, a regulatory claim carries less weight than a constitutional claim. In the context of this case, the violation of TRP 715's requirements provides an insufficient basis for Plaintiffs' claims.

Plaintiffs other claims are even more tenuous. Plaintiffs have not produced any evidence to support the equal protection claim in Count II. They have not established that Defendants were aware that Wright had reported problems at the base. This evidence is critical to Plaintiffs' whistleblower claim. *See Hagmeyer v. Dep't of Treasury*, 757 F.2d 1281, 1284 (Fed.Cir. 1985). Additionally, the fact that General Park reacted to one of the alleged safety incidents by awarding a medal to the Guard member who helped stave off injury is persuasive evidence that a cover-up was not attempted.

■ Plaintiffs' challenge to the revoked security clearance is similarly weak. No one has a 'right' to a security clearance. *See Dep't of Navy v. Egan*, 484 U.S. 518, 528, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988). In *Dep't of Navy v. Egan*, the court held that courts should refrain from entertaining national security issues unless Congress specifically provides otherwise. *Id.* at 528–29, 108 S.Ct. at 824–25. Congress has not so provided.

Thus, while the nature of Plaintiffs' claims in Counts I and II generally favors review, the factual weakness of these claims in this case suggests the opposite result.

■ The second factor to be examined is the potential injury to the plaintiff if review is refused. This factor weighs against review by the court. Plaintiff Wright was not initially terminated by the Defendants. He was reassigned to a nonsupervisory position that offered the possi-

---

**2.** TRP 715, Paragraph 2–5 dictates that there must be a "valid reason" for a management-directed reassignment. The reasons for the reassignment must be provided in a written notification. "As a minimum, this notification must: (1) explain why the management-directed reassignment is taking place (must be in sufficient detail to show that the action is for bona fide reasons), ..." TRP 715, Paragraph 2–5b.

bility of higher pay. While Wright might have been overgrade at that position, special precautions were taken by General Park to ensure that Wright would not lose his new position and special pay status for at least two years. Wright was only terminated when he chose not to accept this reassignment. The choice was his.

■ The third factor to be evaluated is the type and degree of anticipated interference that judicial review imposes upon the military. Judicial interference in this case would have a substantial, negative impact on the military. Plaintiff Wright's position as DCM was supervisory in nature. By definition, Wright was one of the top officers in the Guard. Judicial review of personnel decisions at this level would seriously inhibit the functioning of the Guard. It would undercut the ability of the military to make judgments based on military efficiency and it would erode the necessary command structure. Military commanders must make important, and often subjective, decisions about staffing leadership positions. These decisions must not be second-guessed by the judiciary.

■ The final factor for consideration is the extent to which the exercise of military expertise or discretion is involved. "Courts traditionally have deferred to the 'superior knowledge and expertise of professionals' in such matters as duty orders, promotions, demotions, and retention decisions." *Penagaricano,* 747 F.2d at 63 (quoting *Mindes,* 453 F.2d at 202). Clearly, this factor weighs heavily against judicial intervention in this case. The judiciary should avoid burdening the military with court interference in high level staffing decisions.

### b. Count III

■ Count III asserts a claim under the Maine Whistleblowers' Protection Act, 26 M.R.S.A. §§ 831 *et seq.* The basic elements of this claim are similar to Plaintiffs' federal whistleblower claim. Accordingly, it suffers from the same defects.

In addition to the shortcomings highlighted above, the Maine whistleblower claim suffers from two other weaknesses. First, there is a question about whether the Maine Whistleblower Protection Act applies to Maine National Guard units. As we are satisfied that Plaintiffs' claim falls short on other grounds, we will not address this issue other than to note the recent Maine Superior Court decision in *Jacobs v. State of Maine,* Docket No. CV92–84 (Kennebec Sup.Ct. June 8, 1992) (Mead, J.), holding that the Act does not apply to Maine National Guard units. Second, Plaintiffs seek not only civil damages but, also, reinstatement of Plaintiff Wright. Courts have been reluctant to grant such relief. Reinstatement would severely disrupt the "peculiar and special relationship of the soldier to his superiors." *United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954).

For these reasons, and the reasons previously discussed regarding the federal whistleblower claim, Plaintiffs' Count III claim must fail.

### c. Counts IV and V

■ Counts IV and V are, respectively, claims for punitive damages and attorneys' fees. Pursuant to 42 U.S.C. § 1988(b), only the prevailing party is eligible for attorneys' fees. Punitive damages are also only available to the prevailing party. *Bourque v. Bow,* 736 F.Supp. 398, 407 (D.N.H.1990). Counts IV and V are therefore dismissed.

## IV. CONCLUSION

This case presents the Court with a non-justiciable controversy. Accordingly, Defendants' Motion for Summary Judgment is GRANTED.

SO ORDERED.