# Deployment of United States Armed Forces to Haiti

The President has authority to order the deployment of the armed forces to Haiti in order to protect American citizens there.

The deployment is consistent with the War Powers Resolution.

March 17, 2004

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked our Office to confirm in writing our views about the legal basis for the President's recent deployment of the United States armed forces to Haiti. As we explain below, the President has the legal authority to order the deployment. The deployment is also consistent with the War Powers Resolution.

## I.

Since early February of this year, an armed rebellion has sought to overthrow the government of Haitian President Jean-Bertrand Aristide. On February 23, President Bush deployed approximately 50 Marines to protect the United States Embassy in Port-au-Prince, Haiti, from political violence or looting. *See Letter to Congressional Leaders on the Deployment of U.S. Military Forces in Response to Security Concerns for United States Embassy Personnel in Haiti*, 40 Weekly Comp. Pres. Doc. 284 (Feb. 25, 2004).

On February 29, President Aristide announced his resignation and fled the country. The Chief Justice of the Haitian Supreme Court, Boniface Alexandre, was sworn in as the leader of a transitional government, as provided by the Haitian Constitution. S.C. Res. 1529, pmbl., U.N. Doc. S/RES/1529, at 1 (Feb. 29, 2004) ("[t]aking note of the resignation of Jean-Bertrand Aristide as President of Haiti and the swearing-in of President Boniface Alexandre as the acting President of Haiti in accordance with the Constitution of Haiti"). He issued an appeal "to the governments of friendly countries to support with all urgency the peaceful and constitutional process which has begun" in Haiti. Statement of Haitian President Boniface Alexandre (Feb. 29, 2004). Specifically, he "authorize[d] security forces to enter and operate on the territory of the Republic of Haiti for the purpose of conducting activities designed to bring about a climate of security and stability which will support the political processes underway, facilitate the furnishing of humanitarian assistance, and in general help the people of Haiti." *Id*.

On the day Aristide announced his departure, the United Nations Security Council adopted a resolution authorizing the deployment of a Multinational Interim Force in Haiti. S.C. Res. 1529, ¶ 2, U.N. Doc. S/RES/1529, at 2 ¶ 2. The resolution authorized the force to "contribute to a secure and stable environment in the Haitian capital and elsewhere in the country" in order to "facilitate the

provision of humanitarian assistance and the access of international humanitarian workers to the Haitian people in need" and to "facilitate the provision of international assistance to the Haitian police and the Haitian Coast Guard in order to establish and maintain public safety and law and order and to promote and protect human rights." *Id.* ¶ 2(a)–(c), U.N. Doc. S/RES/1529, at 2 ¶ 2(a)–(c). The same day, President Bush announced that he was "order[ing] the deployment of Marines, as the leading element of an interim international force, to help bring order and stability to Haiti." *Remarks on the Resignation of President Jean-Bertrand Aristide of Haiti*, 40 Weekly Comp. Pres. Doc. 310 (Feb. 29, 2004). France, Canada, and Chile have also deployed troops to Haiti.

## II.

The President has the authority to deploy the armed forces abroad in order to protect American citizens and interests from foreign threats. Under Article II, Section 2 of the Constitution, the President is the "Commander in Chief of the Army and Navy of the United States." U.S. Const. art. II, § 2, cl. 1. Article II also makes the President the Chief Executive. The Supreme Court has "recognized 'the generally accepted view that foreign policy [is] the province and responsibility of the Executive.'" *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981)).

History offers ample evidence for the proposition that the President may take military action abroad, even, as here, in the absence of specific prior congressional authorization. *See* Richard F. Grimmett, Cong. Research Serv., RL30172, *Instances of Use of United States Armed Forces Abroad, 1798–2001* (updated Feb. 5, 2002). Many of these actions have been undertaken to protect American citizens and property. As Attorney General Robert Jackson explained, "the President's authority has long been recognized as extending to the dispatch of armed forces outside of the United States, either on missions of good will or rescue, or for the purpose of protecting American lives or property or American interests." *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 62 (1941). Similarly, the Supreme Court observed in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), that "[t]he United States frequently employs Armed Forces outside this country—over 200 times in our history—for the protection of American citizens or national security." *Id.* at 273.

For example, in *Durand v. Hollins*, 8 F. Cas. 111 (C.C.S.D.N.Y. 1860) (No. 4186), an American naval officer acting under orders from President Pierce bombarded Greytown, Nicaragua, in retaliation for the Nicaraguan government's refusal to make reparations for attacks against United States citizens and property. In ruling on a lawsuit brought against the naval officer, Justice Nelson held that the officer acted properly. He observed that "the interposition of the president abroad, for the protection of the citizen, must necessarily rest in his discretion." *Id.* at 112. More recently, we explained in the context of the Iranian hostage crisis that

"the President has the constitutional power as Chief Executive and Commander-in-Chief to protect the lives and property of Americans abroad." *Presidential Powers Relating to the Situation in Iran*, 4A Op. O.L.C. 115, 121 (1979). Similarly, we concluded in 1992 that the President had authority to deploy the armed forces to Somalia to protect "private United States citizens engaged in relief operations, and United States military personnel conducting humanitarian supply flights." *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 10 (1992).

In light of these principles, the President has authority to order the deployment of the armed forces to Haiti in order to protect American citizens there. *See* Department of Defense News Briefing: Secretary Rumsfeld and General Myers (Mar. 1, 2004), *available at* http://www.defense.gov/transcripts/archive.aspx (last visited May 31, 2013) (Defense Secretary Rumsfeld stating that the mission of the forces deployed to Haiti is in part "to protect U.S. citizens"). Thousands of Americans live in Haiti,[1] and the President could reasonably conclude that they would be in danger if the country were to descend into lawlessness. He also could reasonably decide that the deployment is necessary to protect American property, such as the United States Embassy in Haiti.

When the armed forces are deployed for the protection of American citizens and property, their mission once deployed need not be so narrowly limited. As we explained in our opinion on the Somalia deployment, "[p]ast military interventions that extended to the protection of foreign nationals provide precedent for action to protect endangered Somalians and other non-United States citizens." *Military Forces in Somalia*, 16 Op. O.L.C. at 11. For example, in 1965 President Johnson ordered military intervention in the Dominican Republic "to preserve the lives of American citizens and citizens of a good many other nations." *An Assessment of the Situation in the Dominican Republic*, 53 Dep't St. Bull. 19, 20 (1965). And during the Boxer Rebellion in China, President McKinley sent United States troops as part of a multinational force to lift the siege of the foreign quarters in Beijing. *See Compilation of the Messages and Papers of the Presidents, 1789–1902*, Supplement 113, 115–20 (James A. Richardson ed., 1904).

The President also may determine that the deployment is necessary to protect American foreign policy interests. One such interest is the preservation of regional stability. As we noted in our opinion on the introduction of armed forces into Bosnia, the President may employ the armed forces to protect an American interest in "preserving peace in the region." *Proposed Deployment of United States Armed Forces Into Bosnia*, 19 Op. O.L.C. 327, 332 (1995). Given the proximity of Haiti to the United States, the United States has an obvious interest in maintaining peace and stability in that country. This is especially so because past instances of

---

[1] According to the website of the United States Embassy in Haiti, "[a]pproximately 15,000 U.S. citizens are registered at the Consular Section, but many more are believed to reside in the country." *See* http://usembassy.state.gov/haiti/wwwhc00e.html (last visited Mar. 4, 2004).

unrest in Haiti have led to the mass emigration of refugees attempting to reach the United States. *See* Address to the Nation on Haiti, 2 *Pub. Papers of Pres. William J. Clinton* 1558, 1559 (Sept. 15, 1994) (President Clinton stated that his 1994 deployment of troops to Haiti was appropriate because in the absence of intervention, "[w]e will continue to face the threat of a mass exodus of refugees and its constant threat to stability in our region and control of our borders"); *see also Letter to Congressional Leaders on the Further Deployment of United States Military Forces in Haiti*, 40 Weekly Comp. Pres. Doc. 317 (Mar. 2, 2004) ("*Further Deployment Letter*") (noting that the deployment will "facilitate the continued repatriation of Haitian migrants").

Another American interest in Haiti arises from the involvement of the United Nations in the situation there. In an opinion supporting President Truman's decision to aid the United Nations in defending South Korea in 1950, the State Department observed that "[t]he continued existence of the United Nations as an effective international organization is a paramount United States interest." *Authority of the President to Repel the Attack in Korea*, 23 Dep't St. Bull. 173, 177 (1950). And in our opinion on the Somalia deployment, we noted that "maintaining the credibility of United Nations Security Council decisions, protecting the security of United Nations and related relief efforts, and ensuring the effectiveness of United Nations peacekeeping operations can be considered a vital national interest." *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. at 11. In this case, the deployment will help to create the conditions in which a Multinational Interim Force, authorized by a United Nations Security Council Resolution, can be deployed to Haiti. *See Further Deployment Letter* at 317 (noting that the deployment will "help create conditions in the capital for the anticipated arrival of the Multinational Interim Force"). Of course, as Attorney General Barr noted in discussing the Somalia intervention, a Security Council resolution is "not required as a precondition for Presidential action." *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. at 7. Nevertheless, in exercising his authority as Commander in Chief and Chief Executive, the President could choose to take the resolution into account in evaluating the foreign policy and national security interests of the United States that are at stake in Haiti.

## III.

The deployment of armed forces to Haiti is consistent with the War Powers Resolution, Pub. L. No. 93-148, 87 Stat. 555 (1973), *codified at* 50 U.S.C. §§ 1541–1548 (2000). Section 4(a) of the Resolution provides that the President "shall submit" a report to Congress within 48 hours whenever armed forces are introduced (1) "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances," (2) "into the territory, airspace or waters of a foreign nation, while equipped for combat, except for deployments which relate solely to supply, replacement, repair, or training of such

forces," or (3) "in numbers which substantially enlarge United States Armed Forces equipped for combat already located in a foreign nation." 87 Stat. at 555–56. After the President reports the introduction of forces into imminent or actual hostilities under section 4(a)(1), the Resolution purports to require him to withdraw those forces within 60 days (or 90 days, based on military necessity) unless Congress has authorized continued operations. *Id.* § 5(b). This provision does not apply when the armed forces are introduced to a situation described in section 4(a)(2) or section 4(a)(3).

The War Powers Resolution does not purport to limit the President's authority to deploy the armed forces without congressional authorization; on the contrary, it "recognizes and presupposes the existence of unilateral presidential authority to deploy armed forces 'into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances.'" *Deployment of United States Armed Forces Into Haiti*, 18 Op. O.L.C. at 175; *see also Proposed Deployment of United States Armed Forces Into Bosnia*, 19 Op. O.L.C. at 335. To be sure, the Resolution provides for reports by the President, but we understand that the President has already informed Congress of the deployment, thus satisfying any reporting requirement that may apply. *See Further Deployment Letter*.

At this time, we need not determine whether the situation in Haiti is one where "imminent involvement in hostilities is clearly indicated by the circumstances" within the meaning of the Resolution's 60-day provision, or whether the War Powers Resolution is constitutional. But it is surely relevant to the question whether "involvement in hostilities" is "imminent" that the deployment is at the express invitation of the government of Haiti. And the departure of President Aristide creates at least some possibility that large-scale fighting between rebels and pro-Aristide forces may come to an end. Although it is also possible that some level of violence and instability will continue, we previously have concluded that "the term 'hostilities' should not be read necessarily to include sporadic military or paramilitary attacks on our armed forces." *Presidential Power to Use Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 194 (1980).

We believe that the President has authority to order the deployment of the United States armed forces to Haiti for the purposes we have discussed.

JACK L. GOLDSMITH III
*Assistant Attorney General*
*Office of Legal Counsel*