**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Plaintiffs,**

v.

**Lauro CAVAZOS, Secretary, Department of Education, Defendant.**

Civ. A. No. 89–0775.

United States District Court, District of Columbia.

July 26, 1989.

Mark D. Roth, Gen. Counsel, Joe Goldberg, Anne Wagner, Staff Counsel, AFGE, AFL–CIO, Washington, D.C., for plaintiffs.

Mary E. Goetten, Shawn Jensen, Attys., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

On January 12, 1989, the United States Department of Education (DOE) published its Drug–Free Workforce Plan, a department-wide program of drug testing, education and counseling for its employees. Plaintiffs, the American Federation of Government Employees, AFL–CIO (AFGE), its local affiliate, and two DOE employees represented by AFGE, brought this action seeking to enjoin two aspects of DOE's drug testing program. Resolution of this lawsuit requires consideration of the Supreme Court's two major drug testing opinions, *National Treasury Employees Union v. Von Raab,* — U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) and *Skinner v. Railway Labor Executives' Association,* — U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), as well as the most current decision from our court of appeals, *Harmon v. Thornburgh,* 878 F.2d 484 (D.C.Cir. 1989). Presently pending are plaintiffs' motion for a permanent injunction and a motion for summary judgment filed by defendant Lauro Cavazos, the Secretary of DOE. For the reasons articulated below, these motions will be granted in part and denied in part.

## I. BACKGROUND

On September 15, 1986 President Ronald Reagan issued Executive Order No. 12,564. *See* Plaintiffs' Exhibit (Pls. Ex.) C; 51 Fed. Reg. 32,889 (1986). Entitled "Drug–Free Federal Workplace," the Order requires all federal employees to "refrain from the use of illegal drugs" and directs all heads of Executive Branch agencies to develop "a plan for achieving the objective of a drug-free workplace." Pls. Ex. C at 1–2. It further mandates that, as part of such a plan, each agency head establish "a program to test for the use of illegal drugs by employees in sensitive positions" (with the extent of and criteria for testing to be determined by each agency) as well as a

program for voluntary testing. *Id.* at 2. Agencies are required to provide 60 days' notice to their employees prior to implementing their plans. *Id.*

On July 11, 1987 the Supplemental Appropriations Act of 1987 became law. *See* Pub.L. No. 100–71, 101 Stat. 391 *et seq.* (1987) (codified at 5 U.S.C. § 7301 note). Section 503 of the Act precluded the use of any federal monies to implement Executive Order 12,564 unless a number of requirements were fulfilled. Two are particularly relevant here. In section 503(a)(1)(A)(i), the Secretary of Health and Human Services (HHS) was directed to certify to Congress that the drug-free workplace plan of each federal agency met the dictates of Executive Order 12,564. In section 503(a)(1)(A)(ii), HHS was required to publish mandatory guidelines setting standards for laboratory drug testing and procedures.

HHS published its testing guidelines on April 11, 1988. *See* 53 Fed.Reg. 11,970 *et seq.* On April 27, 1988 the Secretary of HHS certified to Congress that DOE's plan was in conformance with Executive Order 12,564. *See* Pls. Ex. F. On January 12, 1989 DOE issued a revised version of its Plan. Pls. Ex. A. On February 6, 1989 Secretary Cavazos issued an administrative bulletin containing the 60–day notice of drug testing required by Executive Order 12,564.

## II. THE DOE DRUG–FREE WORK-FORCE PLAN

### A. General

DOE's Plan is a multi-faceted program designed to detect and prevent illegal drug use within the agency and to offer assistance to those individuals who need it. Pls. Ex. A at 1. Section III of the Plan establishes an Employee Assistance Program responsible for providing counseling and referral services for employees using drugs, offering education and training programs and assuring the confidentiality of drug testing results. Supervisory personnel are required by Section IV to receive training in the detection of drug abuse and the Department's drug policies and procedures. Section V states that education about the types and effects of drugs shall be offered to all DOE employees. Several positions are created in Section VI to carry out the mandates of the Plan. *See generally id.* at 7–15.

Drug testing is the centerpiece of the DOE Plan, however. Six types are envisioned:

1. Random testing of sensitive employees in certain specified positions (known as "testing designated positions" or "TDPs");
2. Reasonable suspicion testing;
3. Accident or unsafe practice testing;
4. Voluntary testing;
5. Follow-up testing for those employees in counseling or rehabilitation; and
6. Testing of TDP applicants.

Pls. Ex. A at 3. This action concerns only the random and reasonable suspicion aspects of the DOE Plan; each is discussed in more detail below.

### B. Random Testing

In Appendix A to the Plan, DOE listed 106 sensitive positions that would be subject to random drug testing. On May 1, 1989, however, the agency issued a revised list of 115 TDPs subject to random tests. *See* Pls. Ex. G. These 115 positions may be grouped into six categories: (1) law enforcement personnel; (2) operators of motor vehicles; (3) employees with access to sensitive computer or financial data; (4) Presidential appointees; (5) custodians of top secret documents and (6) individuals in the Office of Inspector General. *Id.* at i. A total of 189 employees (approximately 4% of all DOE workers) are eligible for testing, and 12% of them will be randomly tested each year. *Id.* The Plan lists numerous factors that the Secretary considered in selecting positions for random testing.[1]

---

1. These include
   "the extent to which the Department—

1. Considers its mission inconsistent with illegal drug use;
2. Is engaged in law enforcement;

In addition to the general 60–day notice of the Plan's implementation, each employee subject to random testing is provided individual notice stating that his position has been selected as a TDP, that the employee may voluntarily identify himself as a drug user, and that the employee could be tested 30 days after the date of the notice. Pls. Ex. A at 16.[2] When an individual is selected for random testing, both he and his supervisor are notified on the day the test is scheduled to occur, "preferably, within two hours of the scheduled testing." *Id.* at 21. Testing may be postponed for 60 days only when an employee's first- and second-line supervisors agree that a "compelling need necessitates" a deferral. *Id.* at 22.[3]

### C. Reasonable Suspicion Testing

All DOE employees may be tested if a reasonable suspicion exists that they are using drugs. The Plan states that such a suspicion may arise (1) from direct observation of an individual; (2) from "[a] pattern of abnormal conduct or erratic behavior"; (3) when the individual has been arrested for, convicted of, or identified as the target of a criminal investigation into, a drug-related offense; (4) based on "[i]nformation provided either by reliable and credible sources or independently corroborated"; and (5) when newly discovered evidence discloses that the employee tampered with a prior drug test. Pls. Ex. A at 22. The

Plan also articulates a rough standard of proof: "[a]lthough reasonable suspicion testing does not require certainty, mere 'hunches' are not sufficient to meet this standard." *Id.*

The Plan directs that, when an employee is suspected of using illegal drugs, his supervisor shall gather all relevant information that supports his suspicion. *Id.* He must then secure the approval of the second-line supervisor and the concurrence of the Chief of the Labor and Employee Relations Branch. *Id.* If reasonable suspicion is established, the supervisor must prepare a report detailing the reasons that led to the testing, the results of the test, and any action that was taken thereafter. *Id.* at 23.

### D. Test Procedures and Results

DOE tests for drug use by analyzing samples of urine provided by its employees. The Plan seeks to assure privacy by allowing employees to produce their samples unobserved "in a rest room stall or similar enclosure." Pls. Ex. A at 25. When, however, there exists "reason to believe the individual may alter or substitute the specimen to be provided," direct observation by "[c]ollection site personnel of the same gender as the individual tested" is permitted. *Id.*[4] The technical aspects of the urinalysis testing are conducted in accordance with the HHS Guidelines published in April 1988. *See* Pls. Ex. D (hereinafter "Guide-

---

3. Must foster public trust by preserving employee reputation for integrity, honesty and responsibility;
4. Has national security responsibilities; or
5. Has drug interdiction responsibilities."
Pls.Ex. A at 20. In addition, the Secretary examined
"[t]he extent to which the position considered—
1. Authorizes employees to carry firearms;
2. Gives employees access to sensitive information;
3. Authorizes employees to engage in law enforcement;
4. Requires employees to engage in activities affecting public health or safety; or
5. Positions the incumbents of which have custody of top secret documents."
*Id.* at 20–21.

2. If an employee believes that his position has been improperly designated as a TDP, he may

file an appeal within 15 days of receiving the notice. *Id.* at 17.

3. Such a need exists in two circumstances: when the employee is on leave status or is on or about to embark on official travel away from the job site. *Id.*

4. Observation may occur when:
1. A person is being tested on a reasonable suspicion basis;
2. "Facts and circumstances suggest" that the employee is an illegal drug user, is under the influence of drugs when the test is done, or possesses equipment capable of altering his sample;
3. The employee has previously been found to be a drug user by DOE or to have tampered with a drug sample.
*Id.* at 25–26.

lines"). They provide that the urine samples be taken in secure collection sites to which unauthorized personnel do not have access. *Id.* § 2.2(a), (b) & (d). The Guidelines provide 26 "minimum precautions" to "ensure that unadulterated specimens are obtained and correctly identified." § 2.2(f).[5] Once a proper specimen is obtained, the monitor labels the sample and prepares it for shipment to a testing laboratory. §§ 2.2(f)(19)–(26), (g) & (h).

The Guidelines also regulate the laboratories where testing is conducted. First, each lab must be certified to perform urinalysis testing. *See* §§ 3.1 *et seq.* Chain-of-custody, storage and security measures are specified. §§ 2.4(a)-(c). All samples are first subjected to immunoassay screening, § 2.4(e), and any positive results are then confirmed by means of a gas chromatography/mass spectrometry test. § 2.4(f). Specimens are checked for five drugs: marijuana, cocaine, opiates, amphetamines and phencyclidine. *See* Appendix B to Pls. Ex. A.

All results are transmitted directly by the laboratory to DOE's Medical Review Officer (MRO). When a confirmed positive result has been received, the employee is given an opportunity to justify the result to the MRO. In this regard, the MRO may choose to conduct medical interviews of the employee or review relevant medical history. Pls. Ex. A at 26. When, however, the positive result could have resulted from legally prescribed medication, the MRO "must review all medical records made available by the tested employee." *Id.*[6] The Plan provides that "[e]vidence to justify a positive result may include, but is not limited to: (1) a valid prescription; or (2) a

verification from the individual's physician or a valid prescription." *Id.* Thereafter, the MRO produces a report on each positive result, whether justified or not, and forwards it to the administrator of the Employee Assistance Program. *Id.* at 14, 26.

### E. Discipline

When an employee is found to be using illegal drugs, certain mandatory actions follow. First, each employee must be referred to the Employee Assistance Program and must be removed from the federal service if counsel and rehabilitation are refused. *Id.* at 18. In addition, any employee who continues to use drugs after a first finding of illegal use must also be terminated. *Id.* An employee occupying a sensitive position who is found to use drugs must be "immediately remove[d]" from his job, but may be permitted to return if, in the discretion of the Secretary, such a return "would not endanger public health or safety or national security." *Id.*

All other employees found to use drugs must also be disciplined in some fashion, but the punishment "will depend on the circumstances of each case." Pls. Ex. A at 18. The possible measures include:

1. A written reprimand

2. Placement on enforced leave status

3. Suspension for a fixed period of time

4. Suspension until the Employee Assistance Program is successfully completed or until DOE determines that other action is appropriate

5. Removal from the federal service

*Id.* An employee who refuses to take a drug test when required, or who fails to appear without an official deferral, is also

---

5. Among other things, monitors must:
　—Place a bluing agent in the toilet where urination occurs;
　—Ask the employee to remove "unnecessary outer garments";
　—Instruct the employee to wash his hands prior to providing the sample;
　—Prevent the employee from having access to any water fountain, faucet, soap dispenser, cleaning agent or any other material that could be used to alter the specimen;
　—Require the employee to produce more urine until 60 milliliters of fluid are obtained;

　—Collect a new sample if the temperature of the liquid is greater than 99.8 degrees Fahrenheit or below 90 degrees Fahrenheit or if the monitor believes for any other reason that the specimen has been altered.
　*Id.*

6. The Plan specifies that evidence shall not be provided to the MRO in a trial-type proceeding and gives him discretion to accept evidence "in any manner [he] deems most efficient or necessary." Pls.Ex. A at 26.

subject to the full range of disciplinary action. Pls. Ex. A at 19, 26.[7]

### III. THE INSTANT CASE

This lawsuit was commenced on March 23, 1989 by AFGE, its Local 2607 (which represents DOE employees subject to the agency's drug testing plan), and Jo Ann Davis, a DOE employee and member of Local 2607.[8] In its complaint, AFGE contended that the random and reasonable suspicion testing of DOE employees violates the Fourth Amendment's ban against unreasonable searches and seizures, the Civil Service Reform Act of 1978, 5 U.S.C. §§ 2101 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* Plaintiffs sought an injunction preventing implementation of those two aspects of the DOE drug plan. Lauro Cavazos, the Secretary of DOE, was named as the defendant in this action.[9] On May 25, 1989 AFGE filed its motion for a permanent injunction.[10] Defendant Cavazos moved for summary judgment on June 12, 1989. After briefing was completed, oral argument was held on July 6, 1989 and the case was submitted.[11]

### IV. STANDING

DOE seeks to narrow the scope of the challenge mounted by AFGE. It points out

7. If, however, an employee voluntarily identifies himself as a drug user before being detected through other means, obtains counseling or rehabilitation, and thereafter refrains from using illegal drugs, no disciplinary action will be taken by DOE. *Id.* The self-referral option may not be invoked once an employee has been asked to provide a urine sample or is found to have used illegal drugs. *Id.* at 20.

8. On May 25, 1989 plaintiffs were granted leave to file an amended complaint adding another member of Local 2607, Glennie J. Moultrie, to this action. For ease of reference, the Court will describe the plaintiffs collectively as "AFGE."

9. For the sake of simplicity, Secretary Cavazos will be referred to as "DOE" or "defendant" throughout this Opinion.

10. Preliminary relief was not requested because DOE agreed not to institute the Plan prior to the conclusion of collective bargaining talks between it and AFGE. *See* April 13, 1989 Order.

that AFGE does not have any members who are located within the Office of the Inspector General or who are Presidential appointees. Plaintiffs do not dispute this fact. *See* Reply Brief at 7 n. 2. Accordingly, we consider only the testing that is slated for motor vehicle operators, a guard, those with custody of top secret information, and automatic data processors.

### V. GOVERNING LAW

#### A. General

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment's proscriptions are implicated only when a "search" has taken place; in other words, when "an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).[12] *Skinner v. Railway Labor Exec-*

11. Counsel are to be commended for their excellent advocacy, both in pleadings and in arguments before the Court.

12. The Fourth Amendment clearly applies to this case. In *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Supreme Court observed that it "ha[d] never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police" and reiterated that the Amendment was "applicable to the activities of civil as well as criminal authorities." *Id.* at 335, 105 S.Ct. at 739. And in *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), the Court emphasized that "[s]earches and seizures by government employers or supervisors of the private property of their employees ... are subject to the restraints of the Fourth Amendment." *Id.* at 715, 107 S.Ct. at 1497. The fact that DOE's Plan is aimed at governmental rather than private employees and is carried out by civil rather than criminal officials does not strip plaintiffs of the Fourth Amendment's protections. Defendant does not suggest otherwise.

*utives' Association,* —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), identified two such interests that are infringed by urinalysis testing:

[C]hemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee, including whether she is an epileptic, pregnant, or diabetic. Nor can it be disputed that the process of collecting the sample to be tested, which may in some cases involve visual or aural monitoring of the act of urination, itself implicates privacy interests.

109 S.Ct. at 1413. Characterizing those interests as "expectations of privacy that society has long recognized as reasonable," the Court firmly established—if the question were ever in doubt [13]—that "these intrusions must be deemed searches under the Fourth Amendment." *Id. See also National Treasury Employees Union v. Von Raab,* —— U.S. ——, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989).

A "search" conducted by governmental actors assumes constitutional significance, however, only when it is also "unreasonable." *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). In determining reasonableness, a court must examine "all the circumstances surrounding the search ... and the nature of the search ... itself," *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985), and must "balanc[e] its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). In the usual case, these interests are reconciled by requiring the government to obtain a warrant issued by a neutral magistrate and supported by probable cause prior to conducting a search. *See, e.g., United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637,

2641, 77 L.Ed.2d 110 (1983). And in the limited number of situations where the warrant requirement has been dispensed with, probable cause has usually been required. *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).

The Supreme Court has recognized, however, that probable cause "is not an irreducible requirement of a valid search," *New Jersey v. T.L.O.,* 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985), and has recently created an exception when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* at 352, 105 S.Ct. at 748 (Blackmun, J., concurring). If, after engaging in "a careful balancing of public and private interests," *id.* at 341, 105 S.Ct. at 742, the Court determines that "special needs" exist, it judges the validity of the challenged action in accordance with a test of "reasonableness under all the circumstances." *O'Connor v. Ortega,* 480 U.S. 709, 725–226, 107 S.Ct. 1492, 1502–1503, 94 L.Ed.2d 714 (1987). Relying on the "special needs" doctrine, the Court has upheld searches by a high school principal of a student's belongings, *T.L.O.;* by a public employer of its employee's desk, *Ortega;* and by a probation officer of a probationer's home, *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

**B. Recent Drug–Testing Decisions**

The opinions in *Skinner v. Railway Labor Executives' Association,* —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (*Skinner*) and *National Treasury Employees Union v. Von Raab,* —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (*Von Raab*) were issued on March 23, 1989. The court of appeals' decision in *Harmon v. Thornburgh,* 878 F.2d 484 (*Harmon*), was released on June 30, 1989. Because these decisions have a direct bearing on the

---

**13.** Prior to *Skinner,* courts were nearly uniform in holding that urinalysis amounted to a Fourth Amendment "search." In addition to the cases cited by the Court, *see* 109 S.Ct. at 1413 n. 4, decisions from this Circuit had reached a similar conclusion. *See Jones v. McKenzie,* 833

F.2d 335, 338 (D.C.Cir.1987), *vacated and remanded sub nom. Jenkins v. Jones,* —— U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989), *on remand,* 878 F.2d 1476 (D.C.Cir.1989); *National Federation of Federal Employees v. Weinberger,* 818 F.2d 935, 942 (D.C.Cir.1987).

outcome of this action, and because they constitute the legal landscape that forms the backdrop for the instant case, they are discussed at some length below.

### Skinner

*Skinner* involved regulations promulgated by the Federal Railroad Administration that (1) required railroads to conduct urine and blood tests of employees after major train accidents as well as incidents involving fatalities and (2) authorized such testing when reasonable suspicion existed that the employee's conduct contributed to the accident or when certain specified rules had been violated. 109 S.Ct. at 1408–09. After first holding that urine testing [14] constitutes a "search" for Fourth Amendment purposes, the Court turned to the question of the reasonableness of the search. It found that, because the rail employees covered by the testing were performing "safety-sensitive tasks" involving the operation of trains, the government had a "special need" to "ensur[e] the safety of the traveling public and of the employees themselves." 109 S.Ct. at 1414, 1415. The Court next held that a warrant was not a prerequisite for the testing program under its "special needs" doctrine.[15]

The heart of the Court's decision—and the portion most relevant for the instant case—concerns whether probable cause was needed before urine testing of employees could take place. Justice Kennedy, delivering the opinion of the Court, noted that in those instances where the Court had allowed searches with less than probable cause, "we have usually required 'some quantum of individualized suspicion' before concluding that a search is reasonable." *Id.* at 1417 (*quoting United States v. Martinez–Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976)). He continued:

We have made it clear, however, that a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.

*Id.* (citation omitted).

Regarding the employee privacy interests at stake, the majority conceded that the testing compelled employees "to perform an excretory function traditionally shielded by great privacy" which it would "not characterize ... as minimal in most contexts." 109 S.Ct. at 1418. Because, however, the urine sample did not need to be given under direct observation and could be provided in a medical environment to persons unrelated to the railroad employer, and because the covered employees "participat[ed] in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees," *id.*, the Court found that the urine testing "pose[d] only limited threats to the justifiable expectations of privacy of covered employees." *Id.* at 1419. On the other side of the ledger, the government's interest in testing without individualized suspicion was described as "compelling." 109 S.Ct. at 1419. Justice Kennedy observed that the railroad employees performed "duties fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences" and were in a position to "cause great human loss before any signs of impairment become noticeable to supervisors or others." *Id.* In addition,

---

**14.** Although *Skinner* involved both blood and urine testing, those portions of the opinion dealing with blood testing need not be discussed here.

**15.** The Court reached this conclusion because (1) the standardized tests used and the minimal discretion given to administering officials would ensure that there were "virtually no facts

for a neutral magistrate to evaluate," (2) the time needed to procure a warrant could result in "the destruction of valuable evidence" (since drugs within the system are eliminated with the passage of time) and (3) railroad supervisors have had "little occasion to become familiar with the intricacies of this Court's Fourth Amendment jurisprudence." 109 S.Ct. at 1416.

the testing served a deterrent function that would prevent employees "from using controlled substances or alcohol in the first place." *Id.* The urine tests would also provide railroads with "valuable information about the causes of major accidents," thereby allowing "appropriate measures to safeguard the general public." *Id.* at 1420. Finally, because of the "chaotic" scene that often attends a railroad accident, supervisors would be precluded from obtaining evidence of individualized suspicion. *Id.* Because these interests outweighed the privacy concerns, the Court found the urinalysis testing program reasonable under the Fourth Amendment.[16]

### Von Raab

*Von Raab* involved a Customs service program of mandatory drug testing for all agency employees seeking promotion or appointment in three job categories: those with "direct involvement in drug interdiction or enforcement of related laws," those required to carry firearms, and those who handled classified material. 109 S.Ct. at 1388. Relying on *Skinner*, the Court again held that the drug testing was a "search" under the Fourth Amendment and that a warrant was not needed. 109 S.Ct. at 1390–91.[17] It then turned to the issue of probable cause.

Addressing the government's interests first, Justice Kennedy observed that the Customs Service "is our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population," that drug traffickers had developed a "seemingly inexhaustible repertoire of deceptive practices and elaborate schemes for importing narcotics," and that many Customs employees "are often exposed to this criminal element and to the controlled substances they seek to smuggle

into the country." 109 S.Ct. at 1392. As a result of these considerations, the Court determined that the government possessed a "compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment" and that the public interest "demand[ed] effective measures to bar drug users from positions directly involving the interdiction of illegal drugs." *Id.* at 1393. Similarly, a compelling interest existed with respect to Customs Service employees who carried firearms, since the public "should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." *Id.*

The Court then examined the interests of employees subject to testing. Acknowledging that urine testing "could be substantial in some circumstances," it noted that "certain forms of public employment may diminish privacy expectations even with respect to ... personal searches." 109 S.Ct. at 1393. Citing employees of the United States Mint and of the military and intelligence services as examples, the Court held that Customs employees involved in the drug war and those carrying weapons likewise had such a diminished expectation of privacy. *Id.* at 1393–94. It stated:

> Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity. Much the same is true of employees who are required to carry firearms. Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness.

16. The court of appeals had concluded that the testing was unreasonable because it could not detect current impairment. The Court rejected this argument, however, because the regulations placed primary reliance on blood tests (which could detect very recent use) and were designed to deter (as well as detect) drug use and because a finding of recent use would provide a basis for additional investigation by the employer. 109 S.Ct. at 1420–21.

17. It noted that administrative officials were not likely to be familiar with the procedures for obtaining a warrant, that scarce agency resources would be diverted by that process and that a neutral magistrate would have no facts to analyze because of the narrow confines of the program. 109 S.Ct. at 1391.

109 S.Ct. at 1394. As to these individuals, the Court upheld the urinalysis testing program as reasonable.[18]

The Court was, however, "unable, on the present record," to assess the reasonableness of testing employees required to handle classified information. 109 S.Ct. at 1396. The majority stated that the government had a compelling interest "in protecting truly sensitive information from those who, 'under compulsion of circumstances or for other reasons, ... might compromise [such] information.'" *Id.* (*quoting Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988)). It also observed that employees seeking promotions to positions handling such sensitive information could be required to submit to a urine test, "especially if the positions covered under this category require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectations of privacy in respect of a urinalysis test." 109 S.Ct. at 1397. Among the employees listed under the Customs Service testing program were such positions as "Accounting Technician," "Baggage Clerk" and "Messenger," and the Court noted that "it is not evident that those occupying these positions are likely to gain access to sensitive information." *Id.* Because this raised the question "whether the Service has defined this category of employees more broadly than necessary to meet the purposes" of the testing program, the case was remanded to the court of appeals, which was directed to "examine the criteria used by the service in determining what materials are classified and whom to test under this rubric." *Id.*

### Harmon

*Harmon* involved proposed random urinalysis testing of three categories of employees at the Department of Justice: federal prosecutors, workers with access to grand jury proceedings and those holding top secret security clearances. The District Court, in a decision issued prior to *Skinner* and *Von Raab*, enjoined all aspects of the testing as violative of the Fourth Amendment. 690 F.Supp. 65 (D.D.C.1988). After an appeal was taken, the court of appeals affirmed in part, reversed in part and remanded for further proceedings.

The majority first examined the interests asserted by the government to justify the DOJ plan. It concluded that the first—the agency's interest in protecting the integrity of its workforce—could not justify the DOJ program because "federal employment alone" was not sufficient to justify mandatory random testing and because the mere fact that an employee performed law enforcement duties would not satisfy *Von Raab*'s requirement of "a clear, direct nexus ... between the nature of the employee's duty and the nature of the feared violation." Op. at 490. Although recognizing that it was "quite possible" that the DOJ could test employees with substantial responsibility for the prosecution of drug cases consistent with the Fourth Amendment, the court noted that the agency had failed to design such a program to that point. Op. at 490.

With regard to DOJ's interest in assuring public safety, the majority recognized that "a blunder by a Justice Department lawyer may lead, through a chain of ensuing circumstances, to a threat to public safety." *Id.* at 491. But because the public safety rationale articulated by the Court in *Skinner* and *Von Raab* "focused on the *immediacy* of the threat," and because the risk posed by DOJ employees was "indirect" and "more attenuated" than in the cases decided by the Court, the *Harmon* majority refused to allow random testing on this basis. *Id.* (emphasis in original).

Proceeding to consider the agency's interest in protecting sensitive information, the court of appeals upheld testing of em-

---

**18.** The Court was not persuaded by arguments that the program was not instituted in response to any documented drug problem within the agency and that employees could avoid detection through abstinence or adulteration of their samples. As to the former, the Court noted that testing was done as much for deterrence as it was for detection; as for the latter, it disagreed with the position that avoidance was possible. 109 S.Ct. at 1394–96.

ployees holding top secret security clearances, observing that national security materials "lie at [the] very core" of the what the *Von Raab* Court called "truly sensitive information." Op. at 491–492. At the same time, the court of appeals refused to allow testing of all federal prosecutors and those with access to grand jury materials. The court's holding was based on (1) its view that "truly sensitive information" could not include "*all* information which is confidential or closed to public view" because of the great amount of such information and the number of employees exposed to it and (2) the citation in *Von Raab* to *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), a case which the court of appeals noted involved information "of the highest order of confidentiality." Op. at 492 (emphasis in original) & 493.[19]

The parties' contentions about the reasonableness of the random and reasonable suspicion aspects of the DOE Plan are now considered in light of the pertinent law.[20]

## VI. RANDOM TESTING

█ It should be noted that there is some area of common ground. It is now emphatically settled, and defendant does not attempt to argue otherwise, that the drug testing contemplated by the DOE Plan amounts to a "search" for purposes of the Fourth Amendment. *Skinner*, 109 S.Ct. at 1413; *Von Raab*, 109 S.Ct. at 1390; *Harmon*, op. at 487. Moreover, AFGE does not assert that a search warrant must be procured before testing can take place. Thus, the parties have focused their efforts

on the question whether the DOE's Plan is reasonable when the privacy concerns of the agency's workers are balanced against the government's interests in conducting testing.

█ Determining what is reasonable under the Fourth Amendment is a fact-bound undertaking; as the Court did in *Von Raab*, each of the positions to be tested must be examined separately. Before turning to that inquiry, however, the Court must pause to address several general threshold arguments advanced by plaintiffs. AFGE contends, for example, that the Plan is constitutionally infirm because it cannot detect whether an employee is currently impaired but only whether he has recently used drugs. The Supreme Court's recent pronouncements make clear, however, that drug testing also serves as a *deterrent* to further drug use and as a means for the government to collect important information about the behavior and conduct of its employees. *Skinner*, 109 S.Ct. at 1421; *Von Raab*, 109 S.Ct. at 1395. AFGE also makes the argument that urinalysis testing is impermissible because there are other less intrusive alternatives—such as direct observation and training of supervisors—that would lead to the detection of drug abuse. But *Skinner* squarely rejected this approach, with the observation that " '[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative "less intrusive" means.' " 109 S.Ct. at 1419 n. 9 (*quoting Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605,

**19.** The court of appeals concluded by instructing the district court to modify its injunction to permit testing of employees with top secret security clearances. Op. at 492–493. Even though it acknowledged that some of the workers in the prosecutor and grand jury category might be subject to testing because of their drug prosecution duties, the majority maintained the injunction as to these employees to allow DOJ to "reformulat[e] ... its policy" to deal with "the overbreadth of the Department's current testing program." *Id.* at 495–496. While agreeing with the majority's conclusions as to the permissible scope of testing, the dissent would have reached the question of which employees had duties that involved drug prosecutions and allowed testing of those workers.

Although *Harmon* was issued subsequent to the briefing of this case, counsel were able to discuss it in depth at the argument held on July 6, 1989.

**20.** In *Consolidated Rail Corporation v. Railway Labor Executives' Association*, —— U.S. ——, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989), the Supreme Court recently held that a labor dispute concerning the drug testing procedures involved in *Skinner* was "minor" for purposes of the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, but it shed no light on the Fourth Amendment issues and questions presented by the instant case.

2610, 77 L.Ed.2d 65 (1983)). Next, plaintiffs assert that the laboratory procedures used for testing urine samples are unreliable. In *Von Raab*, however, the Court described the nearly-identical procedures used in that case as "highly accurate." 109 S.Ct. at 1394 n. 2. Finally, AFGE repeatedly observes that no study of drug abuse within DOE was ever conducted and that the agency does not have a history of drug-related incidents. A similar situation was presented in *Von Raab*, where the Customs Service was described by its Commissioner as "largely drug-free." 109 S.Ct. at 1387. Although Justice Scalia's eloquent dissent argued that the lack of a drug culture rendered the testing plan unconstitutional, his view did not command a majority of the Court, and the testing program was upheld. Under *Von Raab*, therefore, this Court may not strike down the DOE program simply for lack of evidence that the agency has experienced a drug problem in the past. *See Harmon*, op. at 487–488. Having rejected AFGE's broad arguments, the Court turns to the specific positions at issue in this case.

### Guard

■ One position slated for random testing is a guard to the Secretary of Education. This individual is responsible for maintaining the security of the Secretary's suite and for escorting the Secretary in his movements within the Department of Education. *See* Pls. Ex. P at 1. He is required to carry a firearm at all times and "has ultimate responsibility of protecting the Secretary against assault, harassment, kidnapping and/or assassination attempt." *Id.* AFGE advances two reasons why testing of this individual should not be permitted; neither is persuasive.

AFGE initially contends that testing of this position would be unreasonable because, unlike the Customs agents engaged in front-line drug interdiction in *Von Raab*, the DOE guard does not perform law enforcement duties. Motion at 42. AFGE's contention is debatable, for the guard is required to "perform[ ] police duties in determining whether the facts in an individual case justify arrest action." Pls. Ex. P at

3. But beyond that, *Von Raab* is not as limited as AFGE suggests. In addition to allowing testing of law enforcement personnel, the Supreme Court also upheld urinalysis for "positions that require the incumbent to carry a firearm, even if the incumbent is not directly engaged in the interdiction of drugs." 109 S.Ct. at 1393. Examining the government's interest, the Court explained that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." *Id.* That same risk is also present in the instant case, since the guard is required to carry a gun. With respect to the privacy interests, Justice Kennedy observed that testing was permissible because "successful performance of their [persons carrying firearms] duties depends uniquely on their judgment and dexterity." *Id.* at 1394. Here, the guard must likewise make "prudent, effective and timely decisions" and must be able to "deal effectively with intruders, unstable or violent persons, and with dangerous criminals." Pls. Ex. P at 1. Plaintiffs' first contention must be rejected.

AFGE's also argues that there is no "factual justification" for the proposed testing because there is no evidence that the guard has ever made an arrest or drawn or fired his weapon. Reply Brief at 27. But *Von Raab* did not premise its conclusion that testing was permissible on any showing that Customs agents had ever fired or drawn their weapons in either a proper or improper manner; indeed, there is no mention of the frequency of the agents' firearms-related activity. Accepting AFGE's argument would preclude an agency from preventing possible future harm to the public simply because no harm had occurred in the past, but that requirement finds no support in *Von Raab*. Accordingly, random testing of the DOE guard position is constitutionally permissible.

### Motor Vehicle Operators

■ There are nine motor vehicle operators who would be subject to urinalysis

under the DOE Plan. One of these is a personal driver for the Secretary of Education; the other eight have the more general responsibility of transporting passengers, packages and mail for the rest of DOE. *See* Pls. Exs. N & O. AFGE first suggests that these positions should not be tested because "[t]his case does not involve the type of massive injury and destruction" at issue in *Skinner*, where the Supreme Court upheld drug testing of railroad workers. Motion at 34. The Court would be inclined to agree with plaintiffs' position based solely on the decisions in *Skinner* and *Von Raab*. In discussing the public safety rationale in *Harmon*, however, the court of appeals emphasized that the magnitude of potential harm is not the touchstone of the public safety inquiry. It observed:

> The public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat. The point was that a single slip-up by a gun-carrying agent or a train engineer may have irremediable consequences; the employee himself will have no chance to recognize and rectify his mistake, nor will other government personnel have an opportunity to intervene before the harm occurs.

Op. at 491 (emphasis in original). This language from *Harmon*—stressing as it does the immediacy rather than magnitude of the harm posed and the inability of other governmental personnel to intervene to prevent harm—is equally applicable to the instant case and constrains the Court to reject plaintiffs' first argument. Here, the Secretary's driver must act as a chauffeur for the Secretary and any other United States or foreign dignitaries who have business with the Secretary, Pls. Ex. N at 2, 3, while the other DOE drivers must drive cars, station wagons and trucks to 19 DOE satellite locations within a 500–mile radius of Washington, D.C. Pls. Ex. O at 3. As a result, all of the motor vehicle operators will come into direct contact with other drivers and pedestrians and are therefore in a position where "even a momentary lapse of attention" could result in harm. *Skinner*, 109 S.Ct. at 1419. Moreover, a driver impaired by drugs "will have no

chance to recognize and rectify his mistake, nor will other government personnel have an opportunity to intervene before harm occurs." *Harmon*, op. at 491. Although the harm might well not be as enormous as the *Skinner* situation, it would be *immediate*—the rationale adopted by the court in *Harmon*. While troubled by this conclusion and the implications it holds for all other government drivers, this Court is bound to follow the interpretation adopted by the court of appeals in *Harmon*.

AFGE's other contention is that, if testing of these drivers is upheld, nothing would prevent the government from "imposing mandatory random urine testing on *all* drivers outside the federal employee population." Motion at 35 (emphasis in original); *see also* Reply Brief at 23. Constitutional adjudication, however, normally turns on the actual effects of the practice under review rather than hypothetical constructs. *See, e.g., Mistretta v. United States*, —— U.S. ——, 109 S.Ct. 647, 672, 102 L.Ed.2d 714 (1989) (possibility of future multiple commissions absorbing members of the judiciary "far too remote" to consider with regard to validity of Sentencing Commission). But even were this Court to indulge in speculation, it would still find the testing to be constitutionally reasonable, for AFGE errs in several important respects when it asserts that urine testing of DOE drivers is equivalent to testing of all drivers in general. The Supreme Court has been willing to dispense with the traditional warrant and probable cause requirements only because of the existence of " 'special needs' beyond normal law enforcement." *Skinner*, 109 S.Ct. at 1414 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987)). Plaintiffs have not demonstrated, however, that testing drivers for drug use would present any such "special needs," such as the need to maintain school discipline in *T.L.O.* or the work-related search in *Ortega*. Even more importantly, drug testing was upheld in *Skinner* and *Von Raab* not only because of the government's interest in public safety, but also because of the diminished expectation of privacy

resulting from the type of *employment* the employees had chosen. *Skinner*, 109 S.Ct. at 1418 (railroad workers involved in "an industry that is regulated pervasively to ensure safety"); *Von Raab*, 109 S.Ct. at 1394 (drug agents perform duties that "depend[ ] uniquely on their judgment and dexterity"). The occasional motorist does not, however, choose a particular field of work when he takes to the road and his expectations of privacy would not be reduced by doing so. AFGE's arguments are unpersuasive, and the testing of the motor vehicle operators must be permitted under *Harmon*.[21]

### Employees With Access to Sensitive Information

The final category subject to testing concerns 101 employees who DOE claims have access to sensitive information. These individuals fall into two categories: those who have access to top-secret information and automatic data processors who might have access to sensitive information at one time or another. Each group is addressed separately below.

■ 1. There are 13 DOE employees who have been designated for random testing because they have access to top secret information with national security implications. *See* Pls.Ex. G at 4–5.[22] The *Harmon* panel, noting that the Supreme Court had upheld random testing of those employees with access to "truly sensitive information," observed that "[w]hatever 'truly sensitive' information includes, we agree that it encompasses top secret national security information." Op. at 491. Although AFGE contends that DOE is unable to state with absolute certainty that each of these employees will actually handle top

secret information, *see* Declaration of Gary J. Rasmussen (Rasmussen Dec.), Exhibit C to Defendant's Motion, ¶ 13, a similar argument was rejected in *Harmon*, where the court noted that "[t]he whole point of granting top secret security clearances in advance is to provide flexibility, to ensure that employees can be given access to top secret materials as soon as the need arises." Op. at 492. It is clear, then, that urine testing of these employees is constitutionally permissible.

■ 2. DOE has also designated 88 automatic data processors (ADPs) for random drug testing. The Plan explains that

[e]ach [position] involves either responsibility for the planning, direction and implementation of a computer security program; major responsibility for the direction, planning, and design of a computer system; or access to the operation or maintenance of the system in a way that involves a relatively high risk of causing grave damage or realizing a significant personal gain.

Pls.Ex. G at x. Having carefully considered the arguments presented, I conclude that testing of these employees would be violative of the Fourth Amendment.

In *Von Raab*, the Supreme Court held that employees with access to sensitive information could be tested, "especially if the positions ... require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectations of privacy in respect of a urinalysis test." 109 S.Ct. at 1397. The ADPs clearly are subject to such intrusions. Their positions are all designated as "critical-sensitive." Pls.Ex. G at x. Be-

---

21. In *NTEU v. Watkins*, No. 89–1006 (D.D.C. June 16, 1989), the District Court enjoined random testing of motor vehicle drivers in the Department of Energy. There are important differences between *Watkins* and the instant case. For example, the *Watkins* court noted that the government's interest in testing was "sharply undercut" because there had been no evidence of drug problems within the agency. Opinion at 9. But in *Harmon*—a decision that was issued two weeks *after Watkins*, the court of appeals made clear that such evidence is not required by *Von Raab*. Op. at 487–488. More-

over, the *Harmon* court emphasized that the public safety rationale adopted by the Court depended on the immediacy of the harm presented, an interpretation that the District Court did not have at the time of its ruling in *Watkins*.

22. AFGE has standing to challenge the testing of these employees because one of its members—the personal driver for the Secretary of Education—falls into this category.

fore obtaining their clearance, they must complete a form disclosing information about their personal lives, including prior drug use. Rasmussen Dec. ¶ 15. The ADP employees also must submit to a detailed background investigation, and their clearances are updated on a periodic basis. *Id.* Their expectations of privacy are therefore diminished to some extent.

In order to be reasonable under the Fourth Amendment, however, testing of these individuals must be supported by a "compelling" governmental interest. *Skinner,* 109 S.Ct. at 1419. *Von Raab* held that "the Government has a compelling interest in protecting truly sensitive information from those who, 'under compulsion of circumstances or for other reasons, ... might compromise [such] information.'" 109 S.Ct. at 1396 (quoting *Department of the Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988)). Testing would therefore be appropriate only if the ADPs have access to "truly sensitive information." For the reasons articulated below, the Court concludes that they do not.

*Harmon* observed that, although the Supreme Court had not defined the term "truly sensitive information" in *Von Raab,* it had cited *Department of the Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), which involved security clearances for nuclear submarines, as an indication of its view of the term and had remanded the case for further consideration of whether the Customs Service had defined its testing program "more broadly than necessary" to protect sensitive information. Op. at 492. Stating that "caution should be used in approving this justifica-

tion ["truly sensitive information"] for testing," the *Harmon* majority concluded that the Department of Justice could not test all federal prosecutors and employees with access to grand jury proceedings under this rationale. The caution urged in *Harmon* leads to the conclusion that DOE has failed to adequately justify its interest in testing this group of employees. The Plan states, for example, that the DOE programs supported by the ADPs involve "billions of dollars of government resources" and that "extraordinary measures must be taken to control fraud, waste and mismanagement." Pls.Ex. G at x. But the mere fact that great amounts of money are involved does not mean that the information at issue is "truly sensitive." In addition, although defendant argues that the ADPs could be subjected to bribery, Motion at 27, that likewise does not mean that the information is "truly sensitive." Furthermore, the possibility that ADPs ensconced within the Department of Education could be influenced by "a private contractor with which [DOE] deals," *id.,* is a far cry from the danger posed by the Customs agents in *Von Raab,* who were "often exposed to" drug traffickers and were described as "our Nation's first line of defense" against the drug problem. 109 S.Ct. at 1392. Simply put, DOE has not concretely identified the nature of this information nor the safeguards that would prevent its improper dissemination. Without those details, defendant's assertion of a compelling interest is mere *ipse dixit.*[23]

Another contention presented by DOE, advanced in its reply brief and at oral argument, is that ADPs may have access to "national security information from the Federal Emergency Management Agency

---

**23.** It is important to note that, unlike the Department of Justice or the Customs Service, the Department of Education does not conjure images of an agency that is frequently enmeshed in national security affairs (although its mission is certainly integral to our national welfare). Congress established the DOE in order to "promote the general welfare of the United States," to "help insure that education issues receive proper treatment at the Federal level," and to "enable the Federal Government to coordinate its education activities more effectively." 20 U.S.C. § 3402. And the Plan likewise states that

The mission of the Department of Education is to ensure equal educational opportunities for all individuals; strengthen Federal support of State and local efforts to meet educational needs; encourage increased involvement of parents, students, and the general public in Federal education programs; enhance the quality of education through research, information-sharing, and program evaluations; and improve coordination, management, and accountability in the administration of Federal education programs. Pls.Ex. A at 2.

about national emergency education plans in the event of a nuclear or large-scale military conflict or similar national emergency." Reply at 7–8. This assertion, and therefore the strength of DOE's interest, is difficult to assess, because defendant nowhere delineates the extent to which this material is disseminated within the agency. Moreover, this "national emergency" interest is not mentioned in the Plan, *see* Pls.Ex. G at x, nor is it discussed in the job descriptions of the employees who are subject to testing. Pls.Exs. H–M. DOE has painted a wide swath on the canvas of confidentiality. As a result, there is no way to know how many of the 88 ADPs would come into contact with the FEMA information and to discern whether this category has been defined "more broadly than necessary." *Von Raab*, 109 S.Ct. at 1397.

The Court finds that defendant has failed to demonstrate a compelling interest in subjecting the 88 ADPs to random urinalysis testing.[24] DOE is free, of course, to fashion a concrete agency policy with specific criteria, subject to court review. But, until and unless this occurs, DOE may not, consistent with the Fourth Amendment, implement testing of these employees on the present record. It will therefore be enjoined from ADP urinalysis testing.

## VII. REASONABLE SUSPICION TESTING

■ Judges of this Court have consistently held that reasonable suspicion testing does not transgress the Fourth Amendment. *See NTEU v. Lyng*, 706 F.Supp. 934, 948–50 (D.D.C.1988) (Flannery); *Bangert v. Hodel*, 705 F.Supp. 643, 650–51

(D.D.C.1989) (Greene); *Hartness*, 712 F.Supp. at 992 (Oberdorfer); *Watkins*, slip op. at 11–12 (Pratt). AFGE does not directly challenge these decisions, but rather argues that each only approved reasonable suspicion testing with the proviso that the supervisor must have individualized suspicion that an employee is impaired while on duty. Motion at 45–46. *Harmon* made clear, however, that the Supreme Court dispensed with the requirement of individualized suspicion. Op. at 487.[25] Moreover, *Skinner* stated that "[e]ven if urine test results disclosed nothing more specific than the recent use of controlled substances by a covered employee, this information would provide the basis for further investigative work designed to determine whether the employee used drugs at the relevant times." 109 S.Ct. at 1421. AFGE's contention is also foreclosed by the recent decision in *Jones v. Jenkins*, 878 F.2d 1476 (D.C.Cir.1989). In *Jones*, a case involving urinalysis testing of bus drivers in the District of Columbia school system, the court had originally stated, *inter alia*, that testing could be justified in the future only if it could detect whether an employee was under the influence of drugs while on duty. 833 F.2d 335, 340–41 (D.C.Cir.1987). A petition for certiorari was filed in the Supreme Court, which vacated and remanded for further consideration in light of *Von Raab* and *Skinner*. 109 S.Ct. 1633. On remand, the court of appeals deleted its previous restriction, noted that the District of Columbia's testing was permissible under a "deterrence" rationale," and cited language from *Skinner* to that effect. *Jones* therefore provides an additional reason why AFGE's request for imposition of

---

**24.** This result is consistent with the result in *Harmon*, where the court of appeals refused to allow testing of all Department of Justice prosecutors and employees with access to grand jury material on the "sensitive information" rationale, and with the opinion in *Connelly v. Horner*, No. 88–5085 (N.D.Cal. June 15, 1989), where the District Court (in a post-*Skinner* and *Von Raab* decision) refused to allow random urine testing of Office of Personnel Management Investigators with access to classified information.

In two pre-*Harmon* decisions, *Hartness v. Bush*, 712 F.Supp. 986 (D.D.C.1989), and *NTEU*

*v. Watkins*, No. 89–1006 (June 16, 1989), Judges Oberdorfer and Pratt enjoined random testing of employees in the General Services Administration, the Executive Office of the President and the Department of Energy, but the scope of "sensitive information" to which those employees were exposed is unclear.

**25.** The two post-*Skinner* decisions from the District Court that imposed an "on-duty" proviso (*Hartness* and *Watkins*) were issued prior to *Harmon* and do not make any mention of the fact that individualized suspicion is not required by *Skinner* and *Von Raab*.

an "individualized suspicion of on-duty impairment" proviso must be rejected.

## VIII. STATUTORY CLAIMS

■ In Count Two of the complaint AFGE asserts that the DOE Plan violates not only the Civil Service Reform Act of 1978 (CSRA) but also the Administrative Procedure Act (APA). Neither contention has merit. The former is based on a provision of the CSRA that prohibits federal agencies from

discriminat[ing] for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others.

5 U.S.C. § 2302(b)(10). Plaintiffs maintain that, because there is no nexus between a positive drug test and the efficiency of the federal service, the Plan violates the CSRA. But as *Von Raab* makes clear, the government also has an interest in deterring illegal drug use within the workplace in addition to the elimination of on-duty impairment. 109 S.Ct. at 1395. Moreover, the question whether an employee has been properly disciplined under the Plan is a fact-specific inquiry, and an individual seeking to challenge an adverse personnel action "will have ample opportunity to have his grievance reviewed by the Merit Systems Protection Board and ultimately the United States Court of Appeals for the Federal Circuit." *NTEU v. Reagan*, 685 F.Supp. 1346, 1355 (E.D.La.1988). Plaintiffs' APA claim must also be rejected for, after raising it only in the complaint, plaintiffs never discussed it thereafter in their pleadings or at oral argument, leading to the conclusion that it had been abandoned.

## IX. REMEDY

■ As noted above, the Court has found that random testing of automatic data processors (as currently proposed by DOE) violates the Constitution. Although there are 88 such individuals, AFGE has only eight members within this category,

and thus the Court must determine whether to enjoin testing of all employees in this group or only those who are members of AFGE.

In *Harmon*, the court of appeals did not reach the question whether its decision should be limited to named plaintiffs, since the agency had not challenged the injunction on that ground. Op. at 493 n. 12.[26] But the majority gave strong indications that similarly-situated nonplaintiffs should also be covered. It was observed that, although the *Harmon* panel had earlier modified the district court's injunction to allow testing of employees in categories that were not represented by named plaintiffs, it had not simultaneously limited the injunction only to named plaintiffs. Op. at 493 n. 12. The *Harmon* court also noted that, under "[t]raditional administrative law principles," when a court declares agency regulations to be invalid, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Id.* at 495 n. 21. This Court therefore concludes that the injunction should include similarly-situated non-plaintiffs and that testing of all 88 ADPs, not just the members of AFGE who are ADPs, must be enjoined.

## X. CONCLUSION

For the reasons articulated above, the Court holds that only the random testing of the 88 automatic data processors constitutes an unreasonable search and seizure. Under the present decisional law, the other aspects of the DOE drug testing program at issue here pass constitutional examination.

Accordingly, it is

ORDERED that plaintiffs' motion for a permanent injunction be and it hereby is granted in part and denied in part; it is

FURTHER ORDERED that defendant's motion for summary judgment be and it hereby is granted in part and denied in part; and it is

---

**26.** So too here: DOE has not argued that any injunction issued should be limited to named plaintiffs.

FURTHER ORDERED that defendant Lauro Cavazos, the Secretary of Education, and all of his agents, be and they hereby are permanently enjoined from implementing the DOE Drug–Free Workforce Plan to the extent that it seeks random urinalysis testing of the automatic data processors currently designated for such testing within the Department of Education.