# Placing of United States Armed Forces Under United Nations Operational or Tactical Control

Proposed funding restriction generally prohibiting the President from placing United States Armed Forces under the operational or tactical control of the United Nations in U.N. peacekeeping operations would unconstitutionally constrain the President's exercise of his authority as Commander-in-Chief and unconstitutionally undermine the President's constitutional authority with respect to the conduct of diplomacy.

Granting the President the authority to waive the prohibition if he provides a certification and report to Congress would not remove the funding restriction's constitutional defect, because Congress cannot burden or infringe the President's exercise of a core constitutional power by attaching conditions precedent to the exercise of that power.

May 8, 1996

MEMORANDUM OPINION FOR THE SPECIAL ASSISTANT TO THE PRESIDENT AND
LEGAL ADVISER TO THE NATIONAL SECURITY COUNCIL

This memorandum responds to your request for our views as to the constitutionality of H.R. 3308, 104th Cong. (1996), a bill that would limit the President's ability to place United States armed forces under the United Nations' ("U.N.") operational or tactical control.

Section 3 of H.R. 3308 would add a new section 405 to chapter 20 of title 10, United States Code, to read as follows:

> Except as provided in subsections (b) and (c), funds appropriated or otherwise made available for the Department of Defense may not be obligated or expended for activities of any element of the armed forces that after the date of the enactment of this section is placed under United Nations operational or tactical control, as defined in subsection (f).

Proposed subsection 405(f) provides that elements of the armed forces shall be considered to be placed under U.N. operational or tactical control if they are under the operational or tactical control of an individual who is acting on behalf of the U.N. in a peacekeeping, peacemaking or similar activity, and if the senior military commander of the U.N. force or operation is either a foreign national or a U.S. citizen other than an active duty U.S. military officer.

Proposed section 405 thus bars the President from placing U.S. armed forces participating in U.N. peacekeeping operations under the U.N. operational or tactical control, as so defined.

Two subsections set out exceptions to the prohibition.[1] Subsection 405(c) provides that the limitation does not apply if Congress specifically authorizes a particular placement of U.S. forces under U.N. operational or tactical control, or if the U.S. forces involved in a placement are participating in operations conducted by the North Atlantic Treaty Organization.

Subsections 405(b) and (d) together provide that the President may waive the limitation if he certifies to Congress fifteen days in advance of the placement that it is "in the national security interests of the United States to place any element of the armed forces under United Nations operational or tactical control," and provides a detailed report setting forth specific items of information within eleven distinct categories.[2] If the President certifies that an "emergency" precluded compliance with the fifteen day limitation, he must make the required certification and report in a timely manner, but no later than forty-eight hours after a covered operational or tactical control is initiated.

The proposed amendment unconstitutionally constrains the President's exercise of his constitutional authority as Commander-in-Chief. Further, it undermines his constitutional role as the United States' representative in foreign relations. While "[t]he constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping," *United States v. O'Brien*, 391 U.S. 367, 377 (1968), Congress may not deploy that power so as to exercise functions constitutionally committed to the Executive alone, for that would "pose a 'danger of congressional usurpation of Executive Branch functions.'" *Morrison v. Olson*, 487 U.S. 654, 694 (1988) (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 (1986)). Nor may Congress legislate in a manner that "'impermissibly undermine[s]' the powers of the Executive Branch, [*Commodity Futures Trading Comm'n v.] Schor*, [478 U.S. 833 (1986)] at 856, or 'disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions,' *Nixon v. Administrator of General Services*, [433 U.S. 425 (1977)] at 433." *Morrison*, 487

---

[1] There is also an exception made for ongoing operations in Macedonia and Croatia.

[2] As detailed in subsection 405(d), the report must include eleven distinct elements. It must set forth: (1) a description of the national security interests that would be served by the troop placement; (2) the mission of the U.S. forces involved; (3) the expected size and composition of the U S. forces involved; (4) the precise command and control relationship between the U.S. forces involved and the U.N. command structure; (5) the precise command and control relationship between the U.S. forces involved and the commander of the U.S. unified command for the region in which those U.S. forces are to operate; (6) the extent to which the U.S. forces involved will rely on other nations' forces for security and defense and an assessment of the capability of those foreign forces to provide adequate security to the U.S. forces involved; (7) the exit strategy for complete withdrawal of the U.S. forces involved; (8) the extent to which the commander of any unit proposed for the placement would at all times retain the rights to report independently to superior U.S. military authorities and to decline to comply with orders judged by that commander to be illegal or beyond the mission's mandate until such time as that commander has received direction from superior U.S. military authorities; (9) the extent to which the United States retains the authority to withdraw any element of the armed forces from the proposed operation at any time and to take any action it considers necessary to protect those forces if they are engaged; (10) the extent to which the U.S. forces involved will be required to wear as part of their uniform a device indicating U.N. affiliation; and (11) the anticipated monthly incremental cost to the United States of participation in the U.N. operation by U.S. forces proposed to be placed under U.N. operational or tactical control.

U.S. at 695. Even though there are areas in which both Congress and the President have a constitutional voice, and in which Congress, therefore, may rely on its own constitutional authority to seek to guide and constrain presidential choices, it may not impose constraints in the areas that the Constitution commits exclusively to the President. *See, e.g.,* Letter for Richard Darman, Director, Office of Management and Budget, from Bruce Navarro, Deputy Assistant Attorney General, Office of Legislative Affairs (Feb. 2, 1990) (finding provision of Foreign Relations Authorization Act, Fiscal Years 1990 and 1991, Pub. L. No. 101–246, 104 Stat. 15 (1990), limiting President's ability to receive spies as ambassadors, unconstitutional even though President could waive limitation if it was in the national security interests of the United States to do so).

Article II, Section 2, of the Constitution declares that the *President* "shall be Commander in Chief of the Army and Navy of the United States." Whatever the scope of this authority in other contexts, there can be no room to doubt that the Commander-in-Chief Clause commits to the President alone the power to select the particular personnel who are to exercise tactical and operational control over U.S. forces. *See Fleming v. Page,* 50 U.S. (9 How.) 603, 615 (1850) ("As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual . . . ."). Indeed, the major object of the Clause is to "vest in the President the supreme command over all the military forces, — such supreme and undivided command as would be necessary to the prosecution of a successful war." *United States v. Sweeny,* 157 U.S. 281, 284, (1895); *see also Nordmann v. Woodring,* 28 F. Supp. 573, 578 (W.D. Okla. 1939) ("[A]s Commander in Chief, the President has the power to employ the Army and the Navy in a manner which he may deem most effectual."); *The Federalist No. 69,* at 465 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ("[The Commander in Chief power] would amount to nothing more than the supreme command and direction of the military and naval forces, as first General and Admiral of the confederacy . . . ."); William Howard Taft, *The Boundaries Between the Executive, the Legislative and the Judicial Branches of the Government,* 25 Yale L.J. 599, 610 (1916) (the Commander-in-Chief Clause precludes Congress from "order[ing] battles to be fought on a certain plan" or "direct[ing] parts of the army to be moved from one part of the country to another"); George Sutherland, *Constitutional Power and World Affairs* 76–77 (1919) ("In the actual conduct of military operations, in the field where the battles are being fought, in the movement, disposition and discipline of the land and naval forces, the Commander-in-Chief is supreme."). As Attorney General (later Justice) Robert Jackson explained,

> the President's responsibility as Commander in Chief embraces the authority to command and direct the armed forces in their imme-

diate movements and operations designed to protect the security and effectuate the defense of the United States. . . . [T]his authority undoubtedly includes the power to dispose of troops and equipment in such manner and on such duties as best to promote the safety of the country.

*Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 61–62 (1941).

It is for the President alone, as Commander-in-Chief, to make the choice of the particular personnel who are to exercise operational and tactical command functions over the U.S. Armed Forces. True, Congress has the power to lay down general rules creating and regulating "the framework of the Military Establishment," *Chappell v. Wallace*, 462 U.S. 296, 301 (1983), but such framework rules may not unduly constrain or inhibit the President's authority to make and to implement the decisions that he deems necessary or advisable for the successful conduct of military missions in the field, including the choice of particular persons to perform specific command functions in those missions. Thus, for example, the President's constitutional power to appoint a particular officer to the temporary grade of Marine Corps brigadier general could not be undercut by the failure of a selection board, operating under a general statute prescribing procedures for promotion in the armed services, to recommend the officer for that promotion. *See Promotion of Marine Officer*, 41 Op. Att'y Gen. 291 (1956). As Acting Attorney General Rankin advised President Eisenhower on that occasion, "[w]hile Congress may point out the general class of individuals from which an appointment may be made and may impose other reasonable restrictions it is my opinion that the instant statute goes beyond the type of restriction which may validly be imposed. . . . It is recognized that exceptional cases may arise in which it is essential to depart from the statutory procedures and to rely on constitutional authority to appoint key military personnel to positions of high responsibility." *Id.* at 293, 294 (citations omitted).[3] In the present context, the President may determine that the purposes of a particular U.N. operation in which U.S. Armed Forces participate would be best served if those forces were placed under the operational or tactical control of an agent of the U.N., as well as under a U.N. senior military commander who was a foreign national (or a U.S. national who is not an active duty military officer). Congress may not prevent the President from acting on such a military

---

[3] The Acting Attorney General's opinion relied chiefly on Congress's inability to undermine the President's authority under the Appointments Clause, U.S. Const. art. II, §2, rather than on the promotion procedure's effect on the Commander-in-Chief power. The President's appointment power is not at issue here, because the foreign or other nationals performing command functions at the President's request would be discharging specific military *functions*, but would not be serving in federal *offices*. *See* Memorandum for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Defense Authorization Act* at 2 n.1 (Sept. 15, 1995). Nonetheless, we believe that the reasoning under the Commander-in-Chief Clause closely parallels that under the Appointments Clause.

judgment concerning the choice of the commanders under whom the U.S. forces engaged in the mission are to serve.

Moreover, in seeking to impair the President's ability to deploy U.S. Armed Forces under U.N. operational and tactical command in U.N. operations in which the United States may otherwise lawfully participate, Congress is impermissibly undermining the President's constitutional authority with respect to the conduct of diplomacy. *See, e.g., Department of Navy v. Egan*, 484 U.S. 518, 529 (1988) (the Supreme Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive'") (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981)); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 705–06 n.18 (1976) ("[T]he conduct of [foreign policy] is committed primarily to the Executive Branch."); *United States v. Louisiana*, 363 U.S. 1, 35 (1960) (the President is "the constitutional representative of the United States in its dealings with foreign nations"); *Acquisition of Naval and Air Bases in Exchange for Over-Age Destroyers*, 39 Op. Att'y Gen. 484, 486 (1940) (Jackson, Att'y Gen.) (the Constitution "vests in the President as a part of the Executive function" "control of foreign relations"). United Nations peacekeeping missions involve multilateral arrangements that require delicate and complex accommodations of a variety of interests and concerns, including those of the nations that provide troops or resources, and those of the nation or nations in which the operation takes place. The success of the mission may depend, to a considerable extent, on the nationality of the commanding officers, or on the degree to which the operation is perceived as a *U.N.* activity (rather than that of a single nation or bloc of nations). Given that the United States may lawfully participate in such U.N. operations, we believe that Congress would be acting unconstitutionally if it were to tie the President's hands in negotiating agreements with respect to command structures for those operations. [4]

It might be argued that section 405 does not impose a significant constraint on the President's constitutional authority because it grants the President the authority to waive the prohibition whenever he deems it in the "national security interest" of the United States to do so, provided he reports his decision to execute a waiver to Congress fifteen days in advance. If he certifies that an emergency is present, he may avoid the fifteen day limitation and make a report in a timely manner, but no later than forty-eight hours after troops are placed under U.N. command. Thus, functionally, section 405 effects only a conditional ban on the

---

[4] Past Presidents have committed U.S. forces to foreign command. For example, at a time of great military and diplomatic exigency during the First World War, President Woodrow Wilson agreed, after discussions with our allies, to place U.S. forces under General Foch, a French commander. General Pershing called on General Foch at his headquarters to say, "[i]nfantry, artillery, aviation, all that we have are yours; use them as you wish." 8 Ray Stannard Baker, *Woodrow Wilson: Life and Letters* 60 (1939); *see also id.* at 62 (President Wilson's telegram to General Foch, stating that "[s]uch unity of command is a most hopeful augury of ultimate success"); *id.* at 69–70 (resolution of Supreme War Council, stating that General Foch "is charged by the British, French and American Governments with the coordination of the action of the Allied Armies on the Western Front; to this end there is conferred on him all the powers necessary for its effective realization").

President's constitutional authority to control the tactical and operational deployment of U.S. forces.[5] Congress cannot, however, burden or infringe the President's exercise of a core constitutional power by attaching conditions precedent to the exercise of that power. Attorney General Brownell put the matter well:

> It is recognized that the Congress may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted. It may also impose conditions with respect to the use of the appropriation, provided always that the conditions do not require operation of the Government in a way forbidden by the Constitution. If the practice of attaching invalid conditions to legislative enactments were permissible, it is evident that the constitutional system of the separability of the branches of Government would be placed in the gravest jeopardy.

*Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230, 233 (1955).

Similarly, then-Assistant Attorney General Rehnquist opined:

> Even in the area of domestic affairs, where the relationship between Congress and the President is balanced differently than it is in the field of external affairs, virtually every President since Woodrow Wilson had had occasion to object to certain conditions in authorization legislation as being violative of the separation of powers between the Executive and the legislative branch. The problem would be met in exacerbated form should Congress attempt by detailed instructions as to the use of American forces already in the field to supersede the President as Commander-in-Chief of the armed forces.

William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *The President and the War Power: South Vietnam and the Cambodian Sanctuaries* 21 (May 22, 1970).[6]

We are mindful that Congress has framed its restriction on placing troops under U.N. control as a prohibition on the obligation or expenditure of appropriated funds. That Congress has chosen to invade the President's authority indirectly,

---

[5] Arguably, section 405 effects a complete ban on the use of appropriated funds to support troops under U.N. control in circumstances when the President would find such a deployment advisable but not strictly in the national security interest of the United States. We doubt, however, that such a circumstance is more than hypothetically possible. If the President found it advisable to place U.S. forces under U.N. control, then, ipso facto, it would be in the national security interest to place those troops under U.N. control. To the extent that a contrary circumstance could truly arise, then section 405 is unconstitutional.

[6] In a footnote to the text quoted above, Mr. Rehnquist added· "All of these Presidents have stated in one way or another that just because Congress concededly may refrain from appropriating money at all, it does not necessarily follow that it may attach whatever condition it desires to an appropriation which it does make." *Id.* at 21 n.3.

through a condition on an appropriation, rather than through a direct mandate, is immaterial. Broad as Congress's spending power undoubtedly is, it is clear that Congress may not deploy it to accomplish unconstitutional ends.[7] In particular, as our Office has insisted over the course of several Administrations, "Congress may not use its power over appropriation of public funds ' "to attach conditions to Executive Branch appropriations requiring the President to relinquish his constitutional discretion in foreign affairs." ' " *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports,* 16 Op. O.L.C. 18, 28 (1992) (quoting *Issues Raised by Foreign Relations Authorization Bill,* 14 Op. O.L.C. 37, 42 n.3 (1990) (quoting *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain C.I.A. Covert Actions,* 13 Op. O.L.C. 258, 261 (1989))).[8]

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[7] *See United States v. Lovett,* 328 U.S. 303, 316 (1946) (appropriations power misused to impose bill of attainder); *United States v. Klein,* 80 U.S. (13 Wall.) 128 (1872) (appropriations act unconstitutionally intruded on President's pardon power); *cf. Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 271 (1991) (Congress may not use its power over Federal property to achieve ends by indirect means that it is forbidden to achieve directly); *Frost & Frost Trucking Co. v. Railroad Comm'n,* 271 U.S. 583, 594 (1926) (State legislature cannot attach unconstitutional condition to privilege that it may deny); *see also Mutual Security Program—Cutoff of Funds from Office of Inspector General and Comptroller,* 41 Op. Att'y Gen. 507, 530 (1960) (Att'y Gen. Rogers) ("[T]he Constitution does not permit any indirect encroachment by Congress upon [the] authority of the President through resort to conditions attached to appropriations."); *Constitutionality of Proposed Legislation Affecting Tax Refunds,* 37 Op. Att'y Gen. 56, 61 (1933) (Att'y Gen. Mitchell) ("This proviso can not be sustained on the theory that it is a proper condition attached to an appropriation. Congress holds the purse strings, and it may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted and impose conditions in respect to its use, provided always that the conditions do not require operation of the Government in a way forbidden by the Constitution."), *Memorial of Captain Meigs,* 9 Op. Att'y Gen. 462, 469–70 (1860) (concluding that appropriations bill that contained condition that money be spent only under supervision of congressionally-designated individual was invalid); William P. Barr, *The Appropriations Power and the Necessary and Proper Clause,* 68 Wash. U. L.Q. 623, 628 (1990) ("Congress cannot use the appropriations power to control a Presidential power that is beyond its direct control."); Harold H. Koh, *Why the President (Almost) Always Wins in Foreign Affairs: Lessons of the Iran-Contra Affair,* 97 Yale L.J. 1255, 1303 n.218 (1988) (citing support for view that Congress acts unconstitutionally if it refuses to appropriate funds for President to carry out his enumerated constitutional responsibilities); Kate Stith, *Congress' Power of the Purse,* 97 Yale L.J. 1343, 1351 (1988); Louis Henkin, *Foreign Affairs and the Constitution* 115 (1972) ("Congress cannot impose conditions which invade Presidential prerogatives to which the spending is at most incidental.").

[8] *See also The President's Compliance with the "Timely Notification" Requirement of Section 501(b) of the National Security Act,* 10 Op. O.L.C. 159, 169–70 (1986) ("[W]hile Congress unquestionably possesses the power to make decisions as to the appropriation of public funds, it may not attach conditions to Executive Branch appropriations that require the President to relinquish any of his constitutional discretion in foreign affairs.").

This limitation on legislative power has also been acknowledged by Members of Congress. *See* Orrin Hatch, *What the Constitution Means by Executive Power,* 43 U. Miami L. Rev. 197, 200–01 (1988) ("[C]onstitutional foreign policy functions may not be eliminated by a congressional refusal to appropriate funds. The Congress may not, for example, deny the President funding to receive ambassadors, negotiate treaties, or deliver foreign policy addresses . . . . Congress oversteps its role when it undertakes to dictate the specific terms of international relations."); Eli E. Nobleman, *Financial Aspects of Congressional Participation in Foreign Relations,* 289 Annals Am. Acad. Pol. & Soc. Sci. 145, 150 (1953) (citing remarks of Representative Daniel Webster, objecting on constitutional grounds in 1826 to appropriations rider that purported to attach instructions to United States diplomats).